**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CARL BRYAN,

*Plaintiff-Appellee,*

v.

BRIAN MACPHERSON; CORONADO
POLICE DEPARTMENT; CITY OF
CORONADO, a municipal
corporation,

*Defendants-Appellants.*

No. 08-55622

D.C. No.
3:06-CV-01487-
LAB-CAB

ORDER AND
OPINION

Appeal from the United States District Court
for the Southern District of California
Larry A. Burns, District Judge, Presiding

Argued and Submitted
October 9, 2009—Pasadena, California

Filed November 30, 2010

Before: Harry Pregerson, Stephen Reinhardt and
Kim McLane Wardlaw, Circuit Judges.

Order;
Concurrence to Order by Judge Wardlaw;
Dissent to Order by Judge Tallman;
Opinion by Judge Wardlaw

18883

## COUNSEL

Steven E. Boehmer, David Stotland, Carrie L. Mitchell of McDougal, Love, Eckis, Smith, Boehmer & Foley, El Cajon, California, for the appellant.

Eugene G. Iredale, Julia Yoo of Law Offices of Eugene G. Iredale, San Diego, California, for the appellee.

## ORDER

The opinion filed on June 18, 2010, and reported at 608 F.3d 614, is hereby withdrawn. The clerk shall file the attached superseding opinion.

Having considered the opinion as amended, the panel has unanimously voted to deny the Petition for Panel Rehearing and the Petition for Rehearing En Banc.

The full court was advised of the Petition for Rehearing En Banc and a judge of the court requested a vote on whether to rehear the case en banc. The en banc call failed to receive a majority of votes by active judges in favor of en banc consideration. Fed. R. App. P. 35.

The Petition for Panel Rehearing and the Petition for Rehearing En Banc are DENIED. No further petitions for rehearing or for rehearing en banc may be filed.

---

WARDLAW, Circuit Judge, joined by Judges PREGERSON, REINHARDT, and W. FLETCHER, concurring in the denial of rehearing en banc:

The panel paid the "require[d] careful attention to the facts and circumstances of [this] case, including the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight," *Graham v. Connor*, 490 U.S. 386, 396 (1989). We concluded that Officer Brian MacPherson used excessive force when, on July 24, 2005, he deployed his X26 taser in dart mode to apprehend Carl Bryan for a seatbelt infraction, where Bryan was obviously and noticeably unarmed, made no threatening statements or gestures, did not resist arrest or attempt to flee, but was standing inert twenty to twenty-five feet away from the officer. *See Bryan v. MacPherson*, 608 F.3d 614, 618 (9th Cir. 2010). At the heart of our holding was the conclusion that the X26 taser and similar devices, when used in dart mode, constitute an "intermediate, significant level of force that must be justified by the governmental interest involved." *Id.* at 622. We nonetheless concluded that Officer MacPherson was entitled to qualified immunity from Bryan's 42 U.S.C. § 1983 suit, because this principle was not clearly established in 2005 when Officer MacPherson deployed his dart gun on Bryan. *See id.* at 629. A majority of the active judges of our court voted against rehearing en banc, and I concur.

The opinion accurately recites the factual record and we need not repeat it here. *See id.* at 618-19. Although the panel's original opinion affirmed the district court's denial of quali-

fied immunity, Officer MacPherson and amici curiae League of California Cities and California State Association of Counties suggested we reconsider given that two other taser cases arising from incidents that occurred about the same time as Bryan's tasing were pending in our circuit. We did so, and, although we did not alter our holding that Officer MacPherson used excessive force on Bryan, we concluded that, based on "recent statements [in other circuit opinions] regarding the use of tasers, and the dearth of prior authority," a "reasonable officer in Officer MacPherson's position could have made a reasonable mistake of law regarding the constitutionality of the taser use in the circumstances Officer MacPherson confronted in July 2005." *Id.* at 629. After the panel filed its amended opinion, only Bryan petitioned for panel rehearing or rehearing en banc. Officer MacPherson opposed Bryan's petition, arguing that the panel had correctly applied the law of qualified immunity. In other words, our current decision is a denial of Bryan's — and not Officer MacPherson's — petition for rehearing en banc.

After mischaracterizing the record, misstating our holding, and attacking our opinion for language it does not in fact contain, Judge Tallman ultimately bases his dissent to our decision against rehearing en banc upon the largely unsupported and nonsensical belief that use of a device designed to fire a dart up to one-half inch into bare skin and deliver a 1200 volt charge somehow does not constitute an intermediate use of force. He cites no intra-circuit conflict created by our decision, but instead asserts that we erred by quoting binding circuit precedent. He cites no inter-circuit conflict created by our decision, but instead faults us for joining the growing national judicial consensus that tasers in dart mode constitute an intermediate level of force. More strikingly, he fails to tell the public that our court has simultaneously chosen to rehear the two *other* taser cases en banc — not because those opinions disagreed with the intermediate-level-of-force conclusion in *Bryan*, for they did *not* — but instead to reconsider how best to balance "the nature and quality of the intrusion on the indi-

vidual's Fourth Amendment interests" against "the counter-vailing governmental interests at stake" as required by *Graham*, 490 U.S. at 396. *See Brooks v. City of Seattle*, 599 F.3d 1018 (9th Cir. 2010), *rehr'g en banc granted by* ___ F.3d __, 2010 WL 3896202 (9th Cir. Sep 30, 2010); *Mattos v. Agarano*, 590 F.3d 1082 (9th Cir. 2010), *rehr'g en banc granted by* ___ F.3d ___, 2010 WL 3931122 (9th Cir. Oct 04, 2010).[1]

## I.

Our conclusion that use of the X26 taser and similar devices in dart mode constitutes an "intermediate, significant level of force that must be justified by the governmental interest involved," *Bryan*, 608 F.3d at 622, falls well within the national mainstream of the decisions which have examined the nature and quality of the intrusion posed by tasers. Most recently, the Tenth Circuit (Judges Kelly, Brorby, and Gorsuch) concluded that the use of a taser gun like the one at issue here "against a non-violent misdemeanant who appeared to pose no threat and who was given no warning" was uncon-

---

[1]In *Brooks*, Judges Hall and O'Scannlain properly distinguished tasers employed in stun mode as opposed to dart mode. Citing *Bryan*, the panel majority observed that a taser in "dart" mode is an intermediate level of force, and recognized that "[o]ther circuit and district court decisions have also found the Taser dart application to be an intermediate amount of force." *Brooks*, 599 F.3d at 1027 n.13. In *Mattos*, the three-judge panel (Chief Judge Kozinski, Judge Bybee, and Judge Callahan), addressing the nature and quality of the intrusion resulting from use of a taser in dart mode, noted "[w]e are left with evidence that the Taser, in general, is more than a non-serious or trivial use of force but less than deadly force" and stated "we have no difficulty concluding that the Taser stun was a serious intrusion into the core of the interests protected by the Fourth Amendment: the right to be 'secure in [our] persons.' " *Mattos*, 590 F.3d at 1087 (quoting U.S. Const. amend. IV). In neither decision did the panel find the use of force to be excessive, based upon consideration of the facts unique to each case, and the issue to be determined by the en banc panel is whether that assessment was correct. These appeals have been consolidated for rehearing on December 14, 2010.

stitutional excessive force under *Graham*, for which the officer did not enjoy qualified immunity. *Cavanaugh v. Woods Cross City*, ___ F.3d ___, 2010 WL 4332289, at *2-4 (10th Cir. 2010). Citing our decision in *Bryan*, Judge Kelly wrote

> Although Tasers may not constitute deadly force, their use unquestionably "seizes" the victim in an abrupt and violent manner. Accordingly, the "nature and quality" of the intrusion into the interests of Ms. Cavanaugh protected by the Fourth Amendment was quite severe.

*Id.* at *3. This follows upon numerous decisions agreeing that the use of tasers is at least an intermediate, if nonlethal, level of force. *See*, *e.g.*, *Oliver v. Fiorino*, 586 F.3d 898, 903 (11th Cir. 2009) (recognizing that the taser is "designed to cause significant, uncontrollable muscle contractions"); *Orem v. Rephann*, 523 F.3d 442, 447-48 (4th Cir. 2008) (rejecting the contention that a taser constitutes a minor or *de minimus* level of force); *Hickey v. Reeder*, 12 F.3d 754, 757 (8th Cir. 1993) ("We find defendants' attempt, on appeal, to minimize the pain of being shot with a stun gun . . . to be completely baseless. The defendants' own testimony reveals that a stun gun inflicts a painful and frightening blow, which temporarily paralyzes the large muscles of the body, rendering the victim helpless."); *Cavanaugh v. Woods Cross City*, 2009 WL 4981591, at *5 (D. Utah Dec. 14, 2009) ("The *Graham* factors in this case clearly cautioned against a significant use of force, such as the deployment of a taser."); *Crowell v. Kirkpatrick*, 667 F. Supp. 2d 391, 408 (D. Vt. 2009) (recognizing that tasers have "been described by other courts as 'moderate, non-lethal force" and cause "acute — even severe — physical pain"); *Orsak v. Metro. Airports Comm'n*, 675 F. Supp. 2d 944, 957-59 (D. Minn. 2009); *Cyrus v. Town of Mukwonago*, 2009 WL 1110413, at *21 (E.D. Wis. April 24, 2009) ("The Court will view the use of a taser as an intermediate or medium, though not insignificant, quantum of force . . . ."); *Kaady v. City of Sandy*, 2008 WL 5111101, at *16 (D. Or.

Nov. 26, 2008) ("I therefore conclude that use of a Taser constitutes an intermediate level of force and a significant intrusion on a victim's Fourth Amendment rights."); *McDonald v. Pon*, 2007 WL 4420936, at *2 (W.D. Wash. Dec. 14, 2007) ("Taser use is considered an intermediate control tactic."); *Beaver v. City of Federal Way*, 507 F. Supp. 2d 1137, 1144 (W.D. Wash. 2007) ("[T]he Court first finds that the use of a Taser constituted significant force."); *Parker v. City of South Portland*, 2007 WL 1468658, at *22 (D. Me. May 18, 2007) ("In the circumstances, the Taser fairly can be characterized — as it has been by one court—as a significantly violent level of force."); *DeSalvo v. City of Collinsville*, 2005 WL 2487829, at *4 (S.D. Ill. Oct. 7, 2005). Indeed, Judge Tallman fails to cite a single case in any circuit or district court suggesting otherwise.

The growing national consensus that devices such as the X26 when used in dart mode constitute an intermediate level of force is also clearly reflected in national studies — including the one study that Judge Tallman cites in his dissent — and in the views of law enforcement professionals. *See*, *e.g.*, William P. Bozeman et al., *Safety and Injury Profile of Conducted Electrical Weapons Used by Law Enforcement Officers Against Criminal Suspects*, Annals of Emerg. Medicine, April 2009, at 480 ("Conducted electrical weapons are one of several intermediate force options available to officers faced with violent or combative suspects."); *id.* at 485 ("Prevention of significant or fatal injuries is desirable and an important consideration in discussion of the safety of intermediate force options, including conducted electrical weapons.").

Police research organizations also agree that tasers are at least an intermediate level of force. Canadian Police Research Centre, *Review of Conducted Energy Devices* 25 (Aug. 22, 2005) ("[Controlled Electric Devices] are considered intermediate weapons in the North American, law enforcement, use of force vernacular."), http://www.css.drdc-rddc.gc.ca/cprc/tr/tr-2006-01.pdf; *see also* Merrick Bobb et. al, Police Assess-

ment Resource Center, *A Bad Night at Powell Library: The Events of November 14, 2006,* at 75 ("[T]he shock from a Taser constitutes a significant and painful use of force . . . .").

Tellingly, in a 2005 report on the use of tasers in seven selected law enforcement agencies, the United States Government Accountability Office (GAO) found that six of the seven agencies permitted taser use only when situations had reached the third ("Volatile") and fourth ("Harmful") levels of the five-level FLETC (Federal Law Enforcement Training Center) Use-of-Force Continuum, which permit the use of "Compliance techniques" and "Defensive tactics" respectively. GAO., *Taser Weapons: Use of Tasers by Selected Law Enforcement Agencies*, at 7-10 (May 2005), http://www.gao.gov/new.items/d05464.pdf. In other words, these six agencies classified tasers as *intermediate* levels of force. (Once a situation has reached the fifth ("Lethal") level, officers are permitted to use deadly force in response. *Id.* at 8.)

## II.

Because Officer MacPherson raised an interlocutory appeal to the district court's denial of summary judgment on the basis of qualified immunity, we were bound by the procedural posture to view the facts in the light most favorable to the non-moving party (here Bryan), and then to ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Bryan*, 608 F.3d at 620 (quoting *Graham*, 490 U.S. at 397). In doing so, we remained "cognizant of the Supreme Court's command to evaluate an officer's actions 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.' " *Id.* at 627-28 (quoting *Graham*, 490 U.S. at 396). We concluded that, even viewing the facts from Officer MacPherson's perspective, the "intermediate level of force employed by Officer MacPherson against Bryan was exces-

sive" in light of the facts that Bryan had complied with Officer MacPherson's instructions to pull over based on a minor seatbelt infraction, never attempted to flee, was clearly unarmed, and was standing, without advancing in any direction, next to his vehicle, while Officer MacPherson was standing "approximately twenty feet away observing Bryan's stationary, bizarre tantrum with his X26 drawn and charged." *Id.* at 628. Judge Tallman quibbles with the facts on which we relied and claims that we incorrectly viewed those facts from Bryan's perspective — but the sole example he offers of our supposed judicial astigmatism, our acceptance of the district court's factual determination that "there was no clear indication" that Bryan heard or understood, is "categorically unreviewable on interlocutory appeal." *Eng v. Cooley*, 552 F.3d 1062, 1067 (9th Cir. 2009); *see also Bryan v. McPherson*, 2008 WL 904906, at *3 (S.D. Cal. Apr. 3, 2008) ("While Plaintiff was apparently ignoring McPherson's instructions, there was no clear indication he heard or understood the instructions . . . .").

## III.

We based our holding that use of an X26 taser or similar device in dart mode — not, as Judge Tallman misleadingly suggests, the use of "all tasers" — constitutes an intermediate use of force on uncontested and uncontroversial descriptions in the record and in case law describing how tasers are designed to operate, rather than solely on the injury that Bryan himself suffered when he fell to the pavement and smashed his face and teeth. *See, e.g., Bryan*, 608 F.3d at 620 (citing *Lewis v. Downey*, 581 F.3d 467, 475 (7th Cir. 2009); *Draper v. Reynolds*, 369 F.3d 1270, 1273 n.3 (11th Cir. 2004); *Hickey v. Reeder*, 12 F.3d 754, 757 (8th Cir. 1993)). Indeed, one of the sources of our information on how the X26 taser functions was the manufacturer itself. *See* Taser Int'l, General Faqs, http://www.taser.com/research/Pages/FAQ General.aspx. Taser International explains that its

TASER devices utilize compressed nitrogen to project two small probes up to various ranges . . . at a speed of over 160 feet per second. These probes are connected to the TASER device by insulated wires. An electrical signal is transmitted through the wires to where the probes make contact with the body or clothing, resulting in an immediate loss of the person's neuromuscular control and the ability to perform coordinated action for the duration of the impulse.

## IV.

In concluding that Officer MacPherson used excessive force when he tased Bryan, we explicitly recognized and applied both the "settled principle that police officers need not employ the 'least intrusive' degree of force," *Bryan*, 608 F.3d at 627 n.15 (citing *Gregory v. County of Maui*, 523 F.3d 1103, 1107 (9th Cir. 2008)), and the equally clear rule that "the presence of feasible alternatives is a *factor* to include in our analysis." *Id.* at 627; *see also, e.g.*, *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (en banc); *Headwaters Forest Def. v. County of Humboldt*, 240 F.3d 1185, 1205 (9th Cir. 2000), *vacated and remanded on other grounds sub nom. County of Humboldt v. Headwaters Forest Def.*, 534 U.S. 801 (2001). We see no conflict between the rule that an officer need not use the least intrusive means in apprehending a suspect and the concept that there are nonetheless circumstances in which an officer who does not use the least intrusive means might use a level of force that cannot be justified. Judge Tallman's only concern with the standard we applied is our cite to our nine-year-old decision in *Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001). *Deorle* in fact remains good law, in part because the Supreme Court denied certiorari.[2] We cited

---

[2]At the time *Deorle* was filed, a judge of our court sought but failed to secure rehearing en banc. *See Deorle*, 272 F.3d at 1274-75. The United States Supreme Court then denied Butte County Deputy Sheriff Greg

*Deorle*, along with other opinions, for the obvious principle that the use of force by law enforcement must be justified by an appropriate government interest. Judge Tallman specifically objects to the fact that now-withdrawn versions of our *Bryan* opinion quoted language from *Deorle* and *Drummond* with which he disagrees, but the amended opinion no longer relies upon the language to which he objects. It is puzzling, to say the least, that Judge Tallman continues to rail against *Bryan* for something the opinion does *not* say.

## V.

There is an obvious and critical distinction between concluding (as did one study cited by the dissent) that tasers cause "mild" (rather than "serious" or "fatal") injuries on the one hand and suggesting that tasers cause *no* injuries on the other. *See, e.g.*, Bozeman et al., *supra*, at tbl.5 (finding that injuries characterized as "mild" occur roughly a quarter of a time). Most of the "mild" injuries described in this study "were superficial puncture wounds" from the taser darts, but the fact that puncture wounds through the skin are classified as "superficial" rather than as "serious" or "life-threatening" does not mean that such wounds are *insignificant*. In fact, such "superficial" barbed dart injuries have the potential to be quite significant. *See, e.g.,* GAO, *supra* at 6-7 ("If the barbs penetrate the skin, it is impossible to predict how deeply they will embed . . . . The manufacturer estimated that the barbs will generally penetrate bare skin no more than half an inch."); National Institute of Justice, *Study of Deaths Following Electro Muscular Disruption: Interim Report*, at 3, http://www.ncjrs.gov/pdffiles1/nij/222981.pdf (June 2008)

---

Rutherford's petition for certiorari. *Rutherford v. Deorle*, 536 U.S. 958 (2002). Our court again voted against rehearing a decision that relied upon *Deorle*'s language, *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003), and the Supreme Court again denied certiorari. *City of Anaheim v. Drummond ex rel. Drummond*, 542 U.S. 918 (2004).

("[D]arts may cause puncture wounds or burns. Puncture wounds to an eye by a barbed dart could lead to a loss in vision in the affected eye. Head injuries or fractures resulting from falls due to muscle incapacitation may occur."). In this case, Bryan required emergency surgery to have the dart removed. Moreover, the sudden electrical charge that immobilizes an individual can cause significant injury, especially if the tasered individual, like Bryan, lands on a hard surface.[3] These injuries may even prove fatal, as Taser International's own training materials warn: "The TASER conducted energy weapons cause temporary incapacitation and the inability to catch yourself as you fall. This incapacitation and the resulting fall can be dangerous and *even fatal* under specific circumstances. For example, someone hit by the X26 in a high place could be seriously injured in a fall . . . ." *Bryan v. MacPherson*, No. 06-CV-01487 (S.D. Cal. Mar. 12, 2008) (Dkt 83-4, at 3) (emphasis added).

Such injuries, while perhaps "mild" in an abstract, relative sense, are clearly not insubstantial. Use of a device which can cause such injuries in the mine run of cases surely rises to the level of significant, intermediate force.

## VI.

Judge Tallman claims that we have mischaracterized the facts, but it is Judge Tallman who has mischaracterized the evidence in the record in an attempt to minimize the quantum of force represented by use of an X26 taser or similar device in dart mode. For example, Judge Tallman says that "during training, nearly all Coronado Police Department officers are tased themselves." In fact, the record demonstrates clearly

---

[3]The similar use of the taser on Ms. Cavanaugh, "whose feet were on the front steps of her home," caused her to go rigid, spin around, and strike her head on the concrete steps. *Cavanaugh*, 2010 WL 4332289, at *1. "As a result of this fall, Ms. Cavanaugh suffered a *traumatic brain injury*." *Id*. (emphasis added).

that "[i]t's *not* a requirement" for Coronado officers to be tased before being certified — even though the vast majority in that department reportedly voluntarily were, albeit under highly-controlled circumstances.

The point is irrelevant in any event. The record shows only that Coronado police officers could volunteer to be tased by a taser deployed in drive stun mode while they were being held upright by two other officers. This is because, in the words of the Coronado Police Department trainer, "we don't want them to fall down and hurt themselves in a training session." This opportunity to submit to stungunning obviously has nothing to do with the question of whether an X26 taser in *dart* mode constitutes an intermediate level of force. Moreover, there is absolutely no evidence in the record that Officer MacPherson himself was ever tased in stun *or* dart mode; and, if there were, it would demonstrate that he was well aware of the substantial level of force he used on Bryan, as he would have been familiar with the loss of control (and inability to remain standing rather than crash to the ground) accompanying an electrical current running through the body.

Judge Tallman similarly misrepresents evidence in the record regarding the potential for injury the X26 or similar devices used in dart mode represents to those harpooned and tased. For example, he cites to Taser's own Instructor Certification Lesson Plan from 2004, which makes the unsupported assertion that there is a "0% injury rate for the 26 watt ADVANCED TASER," for the principle that these devices are entirely safe and innocuous. Notably, however, this same document *begins* with a warning that tasers "should be treated as serious weapons and should only be deployed in situations where the alternative would be to use other force measures which carry similar or higher degrees of risk." More importantly, this warning includes an observation about exactly what constitutes an "injury" that casts serious doubt upon the usefulness of the "0% injury rate" figure: the "extensive medical evidence," the document reads, "strongly supports the

TASER X26 and ADVANCED TASER M26 and M18 will not cause lasting aftereffects or fatality . . . ." In other words, in a study in which 1000 volunteers were tased — whether by tasers in drive-stun mode or in dart mode is not clear — none was killed or permanently injured. Fair enough — but surely it is possible for a weapon to cause injury, or even serious injury, without causing death or *permanent* injury.

## VII.

We explicitly "recognize[d] the important role controlled electric devices like the Taser X26 can play in law enforcement" to "help protect police officers, bystanders, and suspects alike." *Bryan*, 608 F.3d at 622. This recognition, however, which is shared by Judge Tallman, is entirely consistent with the eminently reasonable principle that the majority of active judges on our court, along with many other judges and law enforcement personnel, have *also* recognized: the X26 taser and similar devices, when used in dart mode, constitute an "intermediate, significant level of force that must be justified by the governmental interest involved." *Bryan*, 608 F.3d at 622.

I respectfully concur with denial of rehearing en banc.

---

TALLMAN, Circuit Judge, with whom Judges CALLAHAN and N. R. SMITH join, dissenting from the denial of rehearing en banc:

Police officers are allowed to act in reasonable self-defense. Yet, in *Bryan v. MacPherson*, we deem unconstitutional the actions of a police officer who did just that. Coronado Police Officer Brian MacPherson was standing alone on the street when he was confronted by a mostly naked man who reacted with irrational rage to being directed to stop his car for a simple seatbelt violation. He shouted "fuck" over

and over, repeatedly punched his steering wheel, ignored the officer's commands to remain in his car, shouted gibberish, pummeled his own thighs, and did not retreat when the officer yelled at him to get back in his car.

Rather than recognize the serious potential threat to a lone officer's safety posed by someone acting this bizarrely, the panel determines that the officer was unreasonable to think that he was in any danger. Further, the panel's sweeping language deems the officer's use of his taser—an effective means of ensuring compliance that is less likely to cause injury to officers, suspects, and innocent bystanders than nearly any other tool at an officer's disposal—excessive force as a matter of law. Because the panel's decision endangers officers and citizens alike, I dissent from denial of rehearing en banc.

# I

Officer MacPherson's California Sunday was off to a bad start. The City of Coronado police officer was assigned the tedious task of enforcing seatbelt violations early on a Sunday morning in July 2005. To carry out his task, Officer MacPherson stood outside his patrol car in full uniform near a stop sign at the intersection of Pomona Avenue and Glorietta Boulevard to look for violators.

While Officer MacPherson was watching traffic, a tan Toyota Camry driven by Carl Bryan approached. At the time, Bryan was wearing only boxer undershorts, tennis shoes, and socks. Bryan's sixteen-year-old brother Alexander was seated in the passenger seat. Officer MacPherson noticed that the driver was not wearing his seatbelt, so he put out his hand to signal the car to stop. Bryan stopped at the stop sign in the lane of traffic. Officer MacPherson approached the passenger window to speak with him. Looking into the car, Officer MacPherson noticed that the driver was not wearing a shirt. The radio was turned up. Bryan sat in the driver's seat staring

straight ahead with both hands clutching the steering wheel. When the officer asked Bryan to turn the radio down, he turned it off. Officer MacPherson then asked him to pull the car over to the curb. In response, Bryan began punching the steering wheel with both fists and started shouting "fuck" over and over. He was yelling loudly enough that a man playing tennis at a club fifty to seventy-five feet away could hear him screaming "fuck, fuck, fuck." While continuing to pound the steering wheel and shout, Bryan pulled his car ahead and stopped in the intersection blocking a crosswalk several feet from the curb.

Although Bryan was compliant with the Coronado officer's instructions to this point, Officer MacPherson was concerned about the odd behavior he was seeing: the driver was acting in an irrational, violent, angry, and aggressive manner. Because the officer considered that Bryan might be high on PCP or another drug, or might be mentally unstable, he radioed for backup. Help did not arrive in time.

Bryan's next actions did nothing to dispel Officer Mac-Pherson's concerns. Bryan began to open the driver's side door. Officer MacPherson, who was fifteen to twenty feet away, began yelling at him, "Stay in the car, stay in the car, stay in the car," and removed his X26 taser from its holster. Although a jogger forty feet away and the tennis player heard the officer yelling for him to stay in the car, Bryan continued to open the door and get out. Officer MacPherson continued ordering Bryan to get back in the car, but Bryan did not do so.[1]

---

[1]Officers conducting a traffic stop can order occupants to get out of the car. *Maryland v. Wilson*, 519 U.S. 408, 414-15 (1997); *Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1326-27 (9th Cir. 1995). This authority stems from the conclusion that "[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." *Michigan v. Summers*, 452 U.S. 692, 702-03 (1981). It follows that officers can require the occupants to remain in the car as well; indeed, depending on the circumstances, it may well be safer for them to do so. *See*, *e.g.*, *Pennsylvania v. Mimms*, 434 U.S. 106, 119 & n.10 (1977) (Stevens, J., dissenting).

Once out of the car, Bryan started yelling gibberish and pounding his thighs with both fists. He was between the open door and the car, still within arm's reach of the passenger compartment. Fearing for his safety, Officer MacPherson deployed his taser, hitting Bryan with a single dart in the left arm. Bryan fell to the ground, breaking four teeth and cutting and bruising his face.

## II

An officer's use of excessive force to effect an arrest is a violation of a person's Fourth Amendment right to be free from unreasonable searches and seizures. *Graham v. Connor*, 490 U.S. 386, 395 (1989). A citizen's claim that a law enforcement officer used excessive force is analyzed under an "objective reasonableness" standard. *Id*. at 395, 399. Determining whether the force used is reasonable requires a balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id*. at 396 (internal quotation marks and citations omitted). Further, the "standard of reasonableness at the moment applies." *Id.* The reasonableness of the use of force is judged from the perspective of a reasonable officer on the scene—not from the perspective of the person seized or of a court reviewing the situation with 20/20 hindsight. *Id*.

Even if a law enforcement officer uses excessive force in violation of a citizen's Fourth Amendment rights, the officer will still be entitled to qualified immunity unless clearly established law provides that the conduct violates the Fourth Amendment. An officer is shielded from personal liability when he reasonably believes his conduct in the situation is lawful. *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001), *receded from on other grounds by Pearson v. Callahan*, 129 S. Ct. 808, 817-21 (2009) (holding that the "rigid order of battle" inquiry mandated by *Saucier* is no longer required).

The panel's revised opinion correctly determines that the law on whether an officer's use of a taser to control an aggressive and noncompliant subject violated the subject's Fourth Amendment rights was not clearly established, and thus holds that Officer MacPherson is entitled to qualified immunity. Having reached that conclusion, the panel's work should have been done. Instead, the panel goes on to examine whether use of the taser constitutes unconstitutional excessive force. In concluding that it does, the *Bryan* panel mischaracterizes the facts, relies on bad law, and uses contested facts to set future use-of-force policy for all law enforcement officers in the Ninth Circuit.

## A

The *Bryan* panel's first error is in its rendition of the facts. As in any motion for summary judgment, a court considering an officer's qualified immunity must take the facts in the light most favorable to the nonmoving party. *Saucier*, 533 U.S. at 201. In assessing whether an officer is entitled to qualified immunity, however, the court must view those facts from the objective perspective of a reasonable officer on the scene. *Graham*, 490 U.S. at 396. The panel fails to view the facts from this perspective; instead, it relates all of the facts from Bryan's perspective. This is error.

For instance, the panel explains that Bryan didn't hear the officer's commands to stay in or get back into the car and that Bryan hit his steering wheel and yelled obscenities because he was mad at himself for being stopped by police twice in the same morning. While this may be true—and for purposes of summary judgment we assume that it is—it is beside the point. Officer MacPherson didn't know Bryan's motivations. All Officer MacPherson knew was that Bryan did not comply with lawful commands and was exhibiting truly bizarre behavior. It is what Officer MacPherson knew, not Bryan's innocent, post-filing explanation favored by the panel, that must be considered in assessing objective reasonableness.

Because the panel relays the facts from Bryan's perspective, rather than the officer's, it was no doubt easy to conclude that Bryan did not pose any threat to the officer. Looked at from a reasonable officer's perspective, however—as *Graham* requires—Bryan's behavior was volatile, irrational, and alarming. Any reasonable officer would be concerned for his safety.

**B**

The *Bryan* panel also errs by applying the wrong standard for measuring the appropriateness of the force used. In its first two opinions, it determined that all use of tasers "constitute[s] an intermediate, significant level of force that must be justified by a strong government interest [that] *compels* the employment of such force." *Bryan v. MacPherson*, 608 F.3d 614, 622 (9th Cir. 2010) *(quoting Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1057 (9th Cir. 2003), and *Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001)) (first alteration added and internal quotation marks omitted); *see also Bryan v. MacPherson*, 590 F.3d 767, 774-75 (9th Cir. 2009).[2] But the question is not whether the governmental interests *compel* the employment of such force; it is whether the governmental interests *permit* the employment of such force.

In evaluating the governmental interests at stake and the reasonableness of the force used in light of those interests, a reviewing court must examine the totality of the circumstances, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight," among other factors.

---

[2]The previous two opinions in this case are being superseded by a third opinion, filed simultaneously with the order denying rehearing en banc and this dissent. The minor modification made in the panel's third opinion is discussed herein.

*Graham*, 490 U.S. at 396. The right to make an arrest carries with it the right to employ some level of force to effect it. *Id*. A court must consider that the officer may be reacting to a dynamic and evolving situation, requiring the officer to make split-second decisions. *Id*. at 396-97. Accordingly, an officer need not have perfect judgment, nor must he resort only to the least amount of force necessary to accomplish legitimate law enforcement objectives.

Rather, a range of force may be reasonable under the circumstances. *See*, *e.g.*, *Graham*, 490 U.S. at 396 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." (quotation marks and citation omitted)); *see also Forrester v. City of San Diego*, 25 F.3d 804, 807-08 (9th Cir. 1994) ("Police officers, however, are not required to use the least intrusive degree of force possible. Rather . . . the inquiry is whether the force that was used to effect a particular seizure was reasonable, viewing the facts from the perspective of a reasonable officer on the scene. Whether officers hypothetically could have used less painful, less injurious, or more effective force in executing an arrest is simply not the issue." (citations omitted)). The Supreme Court reiterated this standard of analysis in *Saucier*, 533 U.S. at 204-07.

Despite this clear, consistent, and controlling Supreme Court precedent, a single judge of our court, joined only by a senior judge of a different circuit sitting by designation, charted a new path in 2001. Without citing a single case, the court in *Deorle* rewrote the standard: "[T]he degree of force used by [law enforcement] is permissible only when a strong governmental interest compels the employment of such force." 272 F.3d at 1280. To justify this conclusion, the *Deorle* panel quotes *Graham* out of context. Specifically, the *Deorle* majority wrote that the *Graham* factors "are simply a means by which to determine objectively 'the amount of force that is necessary in a particular situation.' " *Id*. (quoting *Graham*, 490 U.S. at 396-97). The full sentence from *Graham*

actually reads: "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. It is clear that *Graham* envisions a flexible standard, appropriate to "reasonableness"; *Deorle* nonetheless requires the police to use only the minimum force necessary. That is not the law the Supreme Court has articulated as the standard applicable to police officers as they make these time-pressured and difficult decisions. *See Saucier*, 533 U.S. at 205 ("If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed.").

In apparent recognition of the fact that the *Deorle* standard is faulty, the panel has again amended its opinion—a single sentence of its opinion—this time to delete the above-quoted language and to state instead that tasers "constitute an intermediate, significant level of force that must be justified by the governmental interest involved." Maj. Op. at 18918. The panel's amendment does not go far enough. The mere deletion of a single reference to *Deorle* does not overrule it; we must go en banc to do so. Moreover, the panel's repeated citations to *Deorle* throughout the rest of the opinion suggest that it considers *Deorle* to present a more preferable standard than the one the Supreme Court has chosen. Indeed, by amending its opinion to more accurately reflect the correct standard without actually applying it, the panel attempts to disguise the fact that it has applied *Deorle* yet again. In so doing, it has ensured that the judgment of the officer on the street, who is not afforded the luxury of time, will nearly always be supplanted by the more ponderous judgment of this Court.

## C

The *Bryan* panel's third mistake is to use a contested record to make sweeping findings about tasers and the harms that

they may cause. While assuming the facts in the light most favorable to Bryan is the appropriate standard for summary judgment, it is not the appropriate platform for severely limiting the use of tasers by law enforcement officers throughout the Ninth Circuit.

A review of the record demonstrates that tasers are generally safe. The record—which included Officer MacPherson's testimony about his own experience with tasers, testimony from the Coronado Police Department's taser expert, materials from the taser's manufacturer, and a report from the International Association of Chiefs of Police National Law Enforcement Policy Center—unequivocally established that the application of a taser to an individual is medically safe and unlikely to cause injury.

For instance, during training nearly all Coronado Police Department officers are tased themselves. The same cannot be said for some of the other compliance techniques at law enforcement's disposal, such as firearms or "flash bang" devices used to disorient barricaded suspects. Further, the evidence in the record showed that human volunteer studies confirmed a zero percent injury rate for the taser and similarly low rates of injury in field studies. In fact, the record showed that "the relative injury rate to both officers and subjects is very low" and "much lower than for blunt impact techniques" like batons and steel flashlights. As a result, most police agencies rate the taser as involving equivalent or even less force than pepper spray because it results in "fewer injuries to both officers and suspects, no aftereffects, [a] shorter period of discomfort[,] and it is target specific."[3]

---

[3]More recent research corroborates the studies cited in the record. For instance, a comprehensive study was conducted at Wake Forest University School of Medicine, and examined all uses of tasers against criminal suspects in six law enforcement agencies over 36 months, which involved 1,201 uses. That study concluded: "Mild or no injuries were observed after [taser] use in 1,198 subjects (99.75% . . . .). Of mild injuries, 83% were

Rather than simply finding Officer MacPherson entitled to qualified immunity, the panel proceeds on a highly contested factual record and finds that all tasers constitute a significant amount of force. It reaches this conclusion based on the injury Bryan alleged he suffered when he fell, as well as limited cases from other circuits, including the Seventh Circuit's speculation that "one need not have personally endured a taser jolt to know the pain that must accompany it." Maj. Op. at 18915 (quoting *Lewis v. Downey*, 581 F.3d 467, 475 (7th Cir. 2009)).

In the concurrence filed contemporaneously with the amended opinion and order denying rehearing en banc, Judge Wardlaw bolsters her argument by misrepresenting two of our cases scheduled to be reheard en banc: *Mattos v. Agarano*, 590 F.3d 1082 (9th Cir. 2010), *reh'g en banc granted by* ___ F.3d ___, 2010 WL 3931122 (9th Cir. Oct. 4, 2010), and *Brooks v. City of Seattle*, 599 F.3d 1018 (9th Cir. 2010), *reh'g en banc granted by* ___ F.3d ___, 2010 WL 3896202 (9th Cir. Sep. 30, 2010).[4] Our opinion in *Brooks* did not analyze the use of tasers in dart mode. Quite to the contrary, we distinguished the use of a taser in stun mode from the use of a taser in dart mode and stated that using a taser in stun mode "was more on par with pain compliance techniques, which this court has found involve a 'less significant' intrusion upon an individual's personal security than most claims of force." 599 F.3d at

---

superficial puncture wounds from [taser] probes. . . . Two subjects died in police custody; medical examiners did not find [taser] use to be causal or contributory in either case." Bozeman, William, et al., *Safety and Injury Profile of Conducted Electrical Weapons Used by Law Enforcement Officers Against Criminal Suspects*, Annals of Emergency Medicine (2009).

[4]Any reliance on these decisions is meaningless at this juncture because the prior opinions are no longer binding now that the court has voted to rehear them en banc. It would be futile to predict the outcome of the en banc proceedings in *Brooks* and *Mattos*, and I do not attempt to do so. Rather, my disagreement stems from the *Bryan* panel's unnecessary factual findings.

1027-28. Because the officers in *Brooks* used the taser in stun mode, the quantum of force used was "less than the intermediate," *id.* at 1028, and the discussion of *Bryan* and other circuit precedent was therefore not necessary to the resolution of the case.

Likewise, there is a fundamental difference between our statement in *Mattos* that using a taser "was a serious intrusion into the core of the interests protected by the Fourth Amendment," 590 F.3d at 1087, and holding that all taser use equates to an intermediate level of force. Any use of force may qualify as a serious intrusion on Fourth Amendment interests. But that does not ipso facto mean that an intermediate level of force was used. It is improper and inaccurate to state that we implied that tasers are an intermediate level of force when, in fact, we merely stated that tasers intrude on Fourth Amendment protections. We did not make such a factual finding in *Mattos*, arguably because of the conflicting and undeveloped record presented to us on appeal. *Id.* The panel would have been well-advised to take a similar approach in *Bryan*.

It is one thing to hold that, if proved, Bryan's allegations could support a jury finding of excessive force. It is another thing entirely for an appellate court reviewing the invocation of qualified immunity to make its own factual finding—based solely on inferences that must be drawn in favor of the injured party and material outside the record—that tasers represent an intermediate and substantial use of force. It is beyond the pale to then apply that judicial fact-finding to prescribe any officer's use of a taser anywhere in the Ninth Circuit.

## III

Courts are ill-equipped to tell law enforcement officers how they must respond when faced with unpredictable and evolving tactical situations. *See Fisher v. City of San Jose*, 558 F.3d 1069, 1080 (9th Cir. 2009) (en banc) (explaining that telling the police confronted with a developing situation involving an

intoxicated and heavily armed tenant "what tactics are permissible" is not "a reasonable role for a judicial officer"). Nor should police officers be required to put life and limb at risk to avoid liability for their conduct when they are reacting to uncertain and rapidly unfolding circumstances, particularly involving mentally unstable subjects who may well attack a lone officer without warning.

Rather than issuing blanket directives based on the facts of a single case, which were taken in the light most favorable to the plaintiff, we must adhere to well-developed Supreme Court law that requires us to analyze each case individually, looking at the totality of the circumstances from the perspective of a reasonable officer on the street. *Graham*, 490 U.S. at 396. Then, we must assess whether a jury could determine that the choice the officer made in the heat of the moment fits within a range of reasonable actions. *Id.* at 396-97. The panel's decision repeatedly applies the wrong standards to reach its desired result—a result that endangers the good faith efforts of law enforcement officers to protect themselves, the community they serve, and the subjects they encounter. Accordingly, I dissent from the denial of rehearing en banc.

---

## OPINION

WARDLAW, Circuit Judge:

Early one morning in the summer of 2005, Officer Brian MacPherson deployed his taser against Carl Bryan during a traffic stop for a seatbelt infraction. Bryan filed this action under 42 U.S.C. § 1983, asserting excessive force in violation of the Fourth Amendment. Officer MacPherson appeals the denial of his motion for summary judgment based on qualified immunity. We affirm the district court in part because, viewing the circumstances in the light most favorable to Bryan, Officer MacPherson's use of the taser was unconstitu-

tionally excessive. However, we reverse in part because the violation of Bryan's constitutional rights was not clearly established at the time that Officer MacPherson fired his taser at Bryan on July 24, 2005.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

Carl Bryan's California Sunday was off to a bad start. The twenty-one year old, having stayed the night with his younger brother and some cousins in Camarillo, which is in Ventura County, planned to drive his brother back to his parents' home in Coronado, which is in San Diego County. However, Bryan's cousin's girlfriend had accidently taken Bryan's keys to Los Angeles the previous day. Wearing the t-shirt and boxer shorts in which he had slept, Bryan rose early, traveled east with his cousins to Los Angeles, picked up his keys and returned to Camarillo to get his car and brother. He then began driving south towards his parents' home. While traveling on the 405 highway, Bryan and his brother were stopped by a California Highway Patrolman who issued Bryan a speeding ticket. This upset him greatly. He began crying and moping, ultimately removing his t-shirt to wipe his face. Continuing south without further incident, the two finally crossed the Coronado Bridge at about seven-thirty in the morning.

At that point, an already bad morning for Bryan took a turn for the worse. Bryan was stopped at an intersection when Officer MacPherson, who was stationed there to enforce seatbelt regulations, stepped in front of his car and signaled to Bryan that he was not to proceed. Bryan immediately realized that he had mistakenly failed to buckle his seatbelt after his earlier encounter with the police. Officer MacPherson approached the passenger window and asked Bryan whether he knew why he had been stopped. Bryan, knowing full well why and becoming increasingly angry at himself, simply stared straight ahead. Officer MacPherson requested that Bryan turn down his radio and pull over to the curb. Bryan complied with both requests, but as he pulled his car to the

curb, angry with himself over the prospects of another cita-
tion, he hit his steering wheel and yelled expletives to himself.
Having pulled his car over and placed it in park, Bryan
stepped out of his car.

There is no dispute that Bryan was agitated, standing out-
side his car, yelling gibberish and hitting his thighs, clad only
in his boxer shorts and tennis shoes. It is also undisputed that
Bryan did not verbally threaten Officer MacPherson and,
according to Officer MacPherson, was standing twenty to
twenty-five feet away and not attempting to flee. Officer Mac-
Pherson testified that he told Bryan to remain in the car, while
Bryan testified that he did not hear Officer MacPherson tell
him to do so. The one material dispute concerns whether
Bryan made any movement toward the officer. Officer Mac-
Pherson testified that Bryan took "one step" toward him, but
Bryan says he did not take any step, and the physical evidence
indicates that Bryan was actually facing away from Officer
MacPherson. Without giving any warning, Officer MacPher-
son shot Bryan with his taser gun. One of the taser probes
embedded in the side of Bryan's upper left arm. The electrical
current immobilized him whereupon he fell face first into the
ground, fracturing four teeth and suffering facial contusions.
Bryan's morning ended with his arrest[1] and yet another drive
—this time by ambulance and to a hospital for treatment.

Bryan sued Officer MacPherson and the Coronado Police
Department, its police chief, and the City of Coronado for
excessive force in violation of 42 U.S.C. § 1983, assault and
battery, intentional infliction of emotional distress, a violation
of California Civil Code § 52.1, as well as failure to train and
related causes of action. On summary judgment, the district
court granted relief to the City of Coronado and Coronado

---

[1]Bryan was charged with resisting and opposing an officer in the perfor-
mance of his duties in violation of California Penal Code § 148. Bryan
was tried on this violation, but following a hung jury, the state dismissed
the charges.

Police Department, but determined that Officer MacPherson was not entitled to qualified immunity at this stage of the proceedings. The court concluded that a reasonable jury could find that Bryan "presented no immediate danger to [Officer MacPherson] and no use of force was necessary." In particular, it found that a reasonable jury could find that Bryan was located between fifteen to twenty-five feet from Officer MacPherson and was not facing him or advancing toward him. The court also found that a reasonable officer would have known that the use of the taser would cause pain and, as Bryan was standing on asphalt, that a resulting fall could cause injury. Under the circumstances, the district court concluded it would have been clear to a reasonable officer that shooting Bryan with the taser was unlawful.

## II. STANDARD OF REVIEW

The district court's denial of qualified immunity is reviewed de novo. *Blanford v. Sacramento County*, 406 F.3d 1110, 1114 (9th Cir. 2005). Where disputed issues of material fact exist, we assume the version of the material facts asserted by the non-moving party. *See KRL v. Estate of Moore*, 512 F.3d 1184, 1188-89 (9th Cir. 2008). All reasonable inferences must be drawn in favor of the non-moving party. *John v. City of El Monte*, 515 F.3d 936, 941 (9th Cir. 2008).

## III. DISCUSSION

**[1]** In evaluating the denial of a police officer's assertion of qualified immunity, we ask two distinct questions. First, we must determine whether, taking the facts in the light most favorable to the non-moving party, the officer's conduct violated a constitutional right; and second, if a violation occurred, whether the right was "clearly established in light of the specific context of the case." *al-Kidd v. Ashcroft*, 580 F.3d 949, 964 (9th Cir. 2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). We may "exercise [our] sound discretion in deciding which of the two prongs of the qualified immunity

analysis should be addressed first." *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).

## A.   Did Officer MacPherson Employ Constitutionally Excessive Force?

**[2]** Allegations of excessive force are examined under the Fourth Amendment's prohibition on unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394 (1989); *Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001). We ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham*, 490 U.S. at 397. We must balance " 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)); *see also Scott v. Harris*, 550 U.S. 372, 383 (2007). Stated another way, we must "balance the amount of force applied against the need for that force." *Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003).

## 1.   Nature and Quality of the Intrusion

We begin by analyzing the quantum of force—the type and amount of force—that Officer MacPherson used against Bryan.[2] *See Deorle*, 272 F.3d at 1279; *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994). Officer MacPherson shot Bryan with a Taser X26 provided by the Coronado Police Department. The X26 uses compressed nitrogen to propel a pair of "probes"—aluminum darts tipped with stainless steel barbs connected to the X26 by insulated wires—toward the target at a rate of over 160 feet per second. Upon striking a person,[3] the X26

---

[2]Although the taser used by Officer MacPherson was the X26 model, our holding applies to the use of all controlled electric devices that cause similar physiological effects.

[3]According to the manufacturer, the probes do not need to penetrate the skin of the intended target to result in a successful connection. The probes are capable of delivering their electrical charge through up to two inches of clothing. Here, Bryan was shirtless when confronted by Officer MacPherson. As a result, one probe penetrated his skin.

delivers a 1200 volt, low ampere electrical charge through the wires and probes and into his muscles.[4] The impact is as powerful as it is swift. The electrical impulse instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless. *See Draper v. Reynolds*, 369 F.3d 1270, 1273 n.3 (11th Cir. 2004); *Hickey v. Reeder*, 12 F.3d 754, 757 (8th Cir. 1993). The tasered person also experiences an excruciating pain that radiates throughout the body. *See Lewis v. Downey*, 581 F.3d 467, 475 (7th Cir. 2009) ("[O]ne need not have personally endured a taser jolt to know the pain that must accompany it . . . ."); *Hickey*, 12 F.3d at 757.

[3] Bryan vividly testified to experiencing both paralysis and intense pain throughout his body when he was tasered. In addition, Officer MacPherson's use of the X26 physically injured Bryan. As a result of the taser, Bryan lost muscular control and fell, uncontrolled, face first into the pavement. This fall shattered four of his front teeth and caused facial abrasions and swelling. Additionally, a barbed probe lodged in his flesh, requiring hospitalization so that a doctor could remove the probe with a scalpel. A reasonable police officer with Officer MacPherson's training on the X26 would have foreseen these physical injuries when confronting a shirtless individual standing on asphalt. We have held that force can be unreasonable even without physical blows or injuries. *See, e.g.*, *Headwaters Forest Def. v. County of Humboldt*, 240 F.3d 1185, 1199 (9th Cir. 2000), *vacated and remanded on other*

---

[4]Tasers have been described as delivering a 50,000 volt charge. *See, e.g.*, *Brown v. City of Golden Valley*, 574 F.3d 491, 495 n.3 (8th Cir. 2009). While technically accurate, this does not entirely describe the electrical impulse encountered by a taser victim. According to the manufacturer, this 50,000 volt charge is needed to ensure that the electrical current can "jump" through the air or victim's clothing, thus completing a circuit. The manufacturer maintains, however, that the full 50,000 volts do not enter the victim's body; rather, it represents that the X26 delivers a peak voltage of 1,200 volts into the body.

*grounds* 534 U.S. 801 (2001);[5] *Tekle v. United States*, 511 F.3d 839, 845 (9th Cir. 2007). The presence of non-minor physical injuries like those suffered by Bryan, however, is certainly relevant in evaluating the degree of the Fourth Amendment intrusion.

**[4]** We, along with our sister circuits, have held that tasers and stun guns fall into the category of non-lethal force.[6] *See, e.g.*, *Lewis*, 581 F.3d at 476; *United States v. Fore*, 507 F.3d 412, 413 (6th Cir. 2007); *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 969 n.8 (9th Cir. 2005).[7] Non-lethal, however, is not synonymous with non-excessive; all force—lethal and non-lethal—must be justified by the need for the specific level of force employed. *Graham*, 490 U.S. at 395; *see also Deorle*, 272 F.3d at 1285 ("Less than deadly force, like deadly force, may not be used without sufficient reason; rather, it is subject to the *Graham* balancing test."). Nor is "non-lethal" a monolithic category of force. A blast of pepper spray and blows from a baton are not necessarily constitutionally equivalent levels of force simply because both are classified as non-lethal. Rather than relying on broad characterizations, we must evaluate the nature of the specific force employed in a specific factual situation. *See Chew*, 27 F.3d at 1441 (stating that the *Graham* factors "are not to be considered in a vacuum but only in relation to the amount of force used to effect a particular seizure.").

---

[5]On remand from the Supreme Court in light of its then-recent opinion in *Saucier*, the *Headwaters* panel reaffirmed its earlier excessive force analysis. *See Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125 (9th Cir. 2002).

[6]"Lethal force" is force that creates a substantial risk of death or serious bodily injury. *See Smith v. City of Hemet*, 394 F.3d 689, 705-07 (9th Cir. 2005) (en banc).

[7]We recognize, however, that like any generally non-lethal force, the taser is capable of being employed in a manner to cause the victim's death. *See, e.g.*, *Oliver v. Fiorino*, 586 F.3d 898, 906 (11th Cir. 2009).

The physiological effects, the high levels of pain, and foreseeable risk of physical injury lead us to conclude that the X26 and similar devices are a greater intrusion than other non-lethal methods of force we have confronted. In *Headwaters*, we held that a jury could conclude that pepper spray was more than a "minimal intrusion" as it caused "intense pain . . . , an involuntary closing of the eyes, a gagging reflex, and temporary paralysis of the larynx." 240 F.3d at 1200. We rejected the district court's characterization of pepper spray's intrusiveness as "merely the infliction of transient pain without significant risk of physical injury." *Id.* at 1199. We similarly reject any contention that, because the taser results only in the "temporary" infliction of pain, it constitutes a nonintrusive level of force. The pain is intense, is felt throughout the body, and is administered by effectively commandeering the victim's muscles and nerves. Beyond the experience of pain, tasers result in "immobilization, disorientation, loss of balance, and weakness," even after the electrical current has ended. *Matta-Ballesteros v. Henman*, 896 F.2d 255, 256 n.2 (7th Cir. 1990); *see also Beaver v. City of Federal Way*, 507 F. Supp. 2d 1137, 1144 (W.D. Wash. 2007) ("[A]fter being tased, a suspect may be dazed, disoriented, and experience vertigo."). Moreover, tasering a person may result in serious injuries when intense pain and loss of muscle control cause a sudden and uncontrolled fall.

**[5]** The X26 thus intrudes upon the victim's physiological functions and physical integrity in a way that other non-lethal uses of force do not. While pepper spray causes an intense pain and acts upon the target's physiology, the effects of the X26 are not limited to the target's eyes or respiratory system. Unlike the police "nonchakus" we evaluated in *Forrester v. City of San Diego*, 25 F.3d 804 (9th Cir. 1994), the pain delivered by the X26 is far more intense and is not localized, external, gradual, or within the victim's control. *Id.* at 807, 805 n.5. In light of these facts, we agree with the Fourth and Eighth Circuit's characterization of a taser shot as a "painful and frightening blow." *Orem v. Rephann*, 523 F.3d 442, 448 (4th

Cir. 2008) (quoting *Hickey*, 12 F.3d at 757). We therefore conclude that tasers like the X26 constitute an "intermediate or medium, though not insignificant, quantum of force," *Sanders v. City of Fresno*, 551 F. Supp. 2d 1149, 1168 (E.D. Cal. 2008); *Beaver*, 507 F. Supp. 2d at 1144 ("[T]he Court first finds that the use of a Taser constituted significant force.").

**[6]** We recognize the important role controlled electric devices like the Taser X26 can play in law enforcement. The ability to defuse a dangerous situation from a distance can obviate the need for more severe, or even deadly, force and thus can help protect police officers, bystanders, and suspects alike. We hold only that the X26 and similar devices when used in dart-mode constitute an intermediate, significant level of force that must be justified by the governmental interest involved.

2.   Governmental Interest in the Use of Force

**[7]** Under *Graham v. Connor*, we evaluate the government's interest in the use of force by examining three core factors, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396; *see also Deorle*, 272 F.3d at 1280. These factors, however, are not exclusive. Rather, we examine the totality of the circumstances and consider "whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*." *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994). This analysis allows us to "determine objectively 'the amount of force that is necessary in a particular situation.' " *Deorle*, 272 F.3d at 1280 (quoting *Graham*, 490 U.S. at 396-97). Viewing the facts in the light most favorable to Bryan, the totality of the circumstances here did not justify the deployment of the Taser X26.

**[8]** The "most important" factor under *Graham* is whether the suspect posed an "immediate threat to the safety of the officers or others." *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc) (quoting *Chew*, 27 F.3d at 1441). "A simple statement by an officer that he fears for his safety or the safety others is not enough; there must be objective factors to justify such a concern." *Deorle*, 272 F.3d at 1281. The district court correctly concluded that Bryan's volatile, erratic conduct could lead an officer to be wary. While Bryan's behavior created something of an unusual situation, this does not, by itself, justify the use of significant force. "A desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury." *Id.* Rather, the objective facts must indicate that the suspect poses an immediate threat to the officer or a member of the public.

**[9]** We agree with the district court that Bryan did not pose an immediate threat to Officer MacPherson or bystanders despite his unusual behavior. It is undisputed that Bryan was unarmed, and, as Bryan was only dressed in tennis shoes and boxer shorts, it should have been apparent that he was unarmed. *Cf. id.* at 1281 ("Deorle was wearing no shirt or shoes, only a pair of cut-off jeans shorts. There was nowhere for him to secrete any weapons."). Although Bryan had shouted expletives to himself while pulling his car over and had taken to shouting gibberish, and more expletives, outside his car, at no point did he level a physical or verbal threat against Officer MacPherson. *See Smith*, 394 F.3d at 702-03 (recognizing that although the victim was shouting expletives, there was no threat leveled against the officer). Bryan was standing, without advancing, fifteen to twenty-five feet away from Officer MacPherson between the door and body of the car. We reject Officer MacPherson's contention that Bryan constituted a threat by taking a step in Officer MacPherson's direction. First, when explicitly asked if he "[took] a step out of the car" or a "step out away from the car," Bryan testified "no." There is, therefore, a genuine issue of fact on this point,

one that, on this procedural posture, we must resolve in Bryan's favor and conclude that Bryan did not advance towards the officer.[8] Second, even if Bryan had taken a single step toward Officer MacPherson, this would not have rendered him an immediate threat justifying an intermediate level of force, as he still would have been roughly nineteen to twenty-four feet away from Officer MacPherson, by the officer's own estimate.

**[10]** Not only was Bryan standing, unarmed, at a distance of fifteen to twenty-five feet, but the physical evidence demonstrates that Bryan was not even facing Officer MacPherson when he was shot: One of the taser probes lodged in the side of Bryan's arm, rather than in his chest, and the location of the blood on the pavement indicates that he fell away from the officer, rather than towards him.[9] An unarmed, stationary individual, facing away from an officer at a distance of fifteen to twenty-five feet is far from an "immediate threat" to that officer. Nor was Bryan's erratic, but nonviolent, behavior a potential threat to anyone else, as there is no indication that there were pedestrians nearby or traffic on the street at the time of the incident.[10] Finally, while confronting Bryan, Offi-

---

[8]Counsel for Officer MacPherson argued that there is no genuine issue regarding whether Bryan took a step towards Officer MacPherson on the basis of Bryan's response to the question of "Did you move your feet in any way?" Bryan answered, "I don't think so." There are, however, any number of ways one can move one's feet without taking a "step." Because Bryan specifically denied taking a step when expressly asked, we find a genuine issue exists as to this fact.

[9]Officer MacPherson's deposition testimony only bolsters this conclusion. He testified that Bryan fell "faced forward" onto the pavement while Bryan similarly testified that he fell straight forward.

[10]Officer MacPherson testified in his deposition that the intersection where he tasered Bryan does not have a lot of traffic on it early on Sunday mornings and that he did not remember the presence of any traffic on the specific morning in question. Other than Bryan, his younger brother, and Officer MacPherson, the record indicates that the only individuals near the scene were an individual playing tennis nearby and a jogger located across the street. Their declarations indicate that they were fifty to seventy-five feet and forty feet away, respectively.

cer MacPherson had unholstered and charged his X26, placing him in a position to respond immediately to any change in the circumstances. The circumstances here show that Officer MacPherson was confronted by, at most, a disturbed and upset young man, not an immediately threatening one.

Officer MacPherson relies heavily on the Eleventh Circuit opinion in *Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004), which addressed the use of a taser during the arrest of an aggressive, argumentative individual. Although we do not adopt *Draper* as the law of this circuit, the present case is clearly distinguishable from the one before the Eleventh Circuit. Unlike Bryan, who was yelling gibberish and gave no sign of hearing or understanding Officer MacPherson's orders, it was undisputed in *Draper* that Draper heard and understood the officer's commands, and not only failed to comply, but engaged the officer in an increasingly heated argument. *Id.* at 1273. Four times the officer asked Draper to retrieve paperwork from the cab of his truck and four times Draper heard the officer, turned toward the truck to comply, but then turned around, walked back toward the officer and loudly accused the officer of "harassing" and "disrespecting" him, displaying a growing belligerence. *Id.* It was not until the fifth time that the officer requested the paperwork and Draper refused to comply, yelled at the officer, and paced toward him in agitation that the officer resorted to the taser. *Id.* The Eleventh Circuit determined that a verbal arrest command (when Draper had refused to comply with the first five commands) accompanied by an attempt to physically handcuff Draper "in these particular circumstances, may well have or would likely have escalated a tense and difficult situation into a serious physical struggle, in which either Draper or [the officer] would be seriously hurt." *Id.* at 1278.

Bryan never addressed, let alone argued with, Officer MacPherson once he left his car. In addition, whereas Bryan remained stationary at a distance of approximately twenty feet, or at most took a single step forward, Draper was located

close to the officer and pacing in an agitated fashion while arguing with him. Id. Thus, the officer in *Draper* was confronting a belligerent, argumentative individual who was angrily pacing within feet of his position. Officer MacPherson, by contrast, was confronted with a half naked, unarmed, stationary, apparently disturbed individual shouting gibberish at a distance of approximately twenty feet. The only similarity to the factual circumstances in *Draper* is that both Draper and Bryan were stopped for a traffic violation, were loud, and were tasered by the police.

**[11]** The severity of Bryan's purported offenses "provide[ ] little, if any, basis for [Officer MacPherson's] use of physical force." *Smith*, 394 F.3d at 702. It is undisputed that Bryan's initial "crime" was a mere traffic infraction—failing to wear a seatbelt—punishable by a fine. Traffic violations generally will not support the use of a significant level of force. *See Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) ("Deville was stopped for a minor traffic violation . . . making the need for force substantially lower than if she had been suspected of a serious crime."). Officer MacPherson also claims that he reasonably believed Bryan had committed three misdemeanors—resisting a police officer, failure to comply with a lawful order, and using or being under the influence of any controlled substance[11]— and that these constitute "serious —and dangerous—criminal activity." We disagree with Officer MacPherson's assessment. While "the commission of a misdemeanor offense is 'not to be taken lightly,' it militates against finding the force used to effect an arrest reasonable where the suspect was also nonviolent and 'posed no threat to the safety of the officers or others.' " *Headwaters*, 240 F.3d

---

[11]Cal. Veh. Code § 2800(a) (making it a misdemeanor to willfully fail or refuse to comply with an order of a peace officer); Cal. Health & Safety Code § 11550 (making it unlawful to "use, or be under the influence of any controlled substance"); Cal. Penal Code § 148 (punishing every individual "who willfully resists, delays, or obstructs any public officer . . . in the discharge . . . of his or her office" with a fine up to $1000 or up to 1 year in a county jail).

at 1204 (quoting *Hammer v. Gross*, 932 F.2d 842, 846 (9th Cir. 1991)). None of the offenses for which Bryan was cited or of which he was suspected is inherently dangerous or violent, and as already discussed, Bryan posed little to no safety threat. *Cf. Parker v. Gerrish*, 547 F.3d 1, 9 (1st Cir. 2008) ("Though driving while intoxicated is a serious offense, it does not present a risk of danger to the arresting officer that is presented when an officer confronts a suspect engaged in an offense like robbery or assault."). Therefore, there was no substantial government interest in using significant force to effect Bryan's arrest for these misdemeanor violations that even the State of California has determined are minor.[12] *Cf. Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003) (finding a felony to be "by definition a crime deemed serious by the state").

[12] Officer MacPherson now argues that use of the taser was justified because he believed Bryan may have been mentally ill and thus subject to detention. To the contrary: if Officer MacPherson believed Bryan was mentally disturbed he should have made greater effort to take control of the situation through less intrusive means. As we have held, "[t]he problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense." *Deorle*, 272 F.3d at 1282-83. Although we have refused to create two tracks of excessive force analysis, one for the mentally ill and one for serious criminals, we have found that even "when an emotionally disturbed individual is

---

[12]Our sister circuits have likewise concluded that misdemeanors are relatively minor and will generally not support the deployment of significant force. *See, e.g.*, *Fogarty v. Gallegos*, 523 F.3d 1147, 1160 (10th Cir. 2008); *Reese v. Herbert*, 527 F.3d 1253, 1274 (11th Cir. 2008). In addition, we have previously suggested that felonies not involving violence provide limited support for the use of significant force under *Graham*. *See Meredith*, 342 F.3d at 1063; *Chew*, 27 F.3d at 1442-43 & n.9.

'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted . . . with a mentally ill individual." *Id.* at 1283. The same reasoning applies to intermediate levels of force. A mentally ill individual is in need of a doctor, not a jail cell, and in the usual case —where such an individual is neither a threat to himself nor to anyone else—the government's interest in deploying force to detain him is not as substantial as its interest in deploying that force to apprehend a dangerous criminal. Moreover, the purpose of detaining a mentally ill individual is not to punish him, but to help him. The government has an important interest in providing assistance to a person in need of psychiatric care; thus, the use of force that may be justified by that interest necessarily differs both in degree and in kind from the use of force that would be justified against a person who has committed a crime or who poses a threat to the community. Thus, whether Officer MacPherson believed that Bryan had committed a variety of nonviolent misdemeanors or that Bryan was mentally ill, this *Graham* factor does not support the deployment of an intermediate level of force.

Turning to Bryan's "resistance," we note that Bryan in fact complied with every command issued by Officer MacPherson except the one he asserts he did not hear—to remain in the car. Even if Bryan failed to comply with the command to remain in his vehicle, such noncompliance does not constitute "active resistance" supporting a substantial use of force. Following the Supreme Court's instruction in *Graham*, we have drawn a distinction between passive and active resistance. *See Forrester*, 25 F.3d at 805 (finding that protestor's "remaining seated, refusing to move, and refusing to bear weight" despite police orders to the contrary constituted "passive resistance"); *see also Headwaters*, 276 F.3d at 1130-31 (finding that protestors, who were chained together with devices and refused to exit a building when ordered, passively resisted).

By shouting gibberish and hitting himself in the quadriceps, Bryan may not have been perfectly passive. "Resistance,"

however, should not be understood as a binary state, with resistance being either completely passive or active. Rather, it runs the gamut from the purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer. We must eschew ultimately unhelpful blanket labels and evaluate the nature of any resistance in light of the actual facts of the case. For example, in *Smith v. City of Hemet*, we confronted an individual who "continually ignored" officer commands to remove his hands from his pockets and to not re-enter his home. In addition, he "physically resisted . . . for only a brief time." 394 F.3d at 703. Although Smith was not perfectly passive in the encounter, we stated that it did not appear "that Smith's resistance was particularly bellicose" and thus found that this factor provided little support for a use of significant force. *Id.* Even purely passive resistance can support the use of some force, but the level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance.

**[13]** Reviewing Bryan's conduct, we conclude that even if we were to consider his degree of compliance solely from the officer's subjective point of view, this case would be closer to the passive resistance we confronted in *Forrester* and *Headwaters* or the minor resistance in *Smith*, than it would be to truly active resistance. The only resistance Officer MacPherson testified to was a failure to comply with his order that Bryan remain in his car. Shouting gibberish and hitting one's quadriceps is certainly bizarre behavior, but such behavior is a far cry from actively struggling with an officer attempting to restrain and arrest an individual. *Compare Abdullahi v. City of Madison*, 423 F.3d 763, 776 (7th Cir. 2005) (involving an arrestee swinging a belt at an officer and "strenuously resist[-ing]" as the police attempted to handcuff him); *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1241-42 (11th Cir. 2003) (involving an arrestee engaging and advancing on officers with a stick); *Jackson v. City of Bremerton*, 268 F.3d 646, 653 (9th Cir. 2001) (involving an individual interfering with an attempted arrest of an individual by engaging the offi-

cer in a "melee"). As in *Smith*, Bryan's "resistance" was not "particularly bellicose." *Smith*, 394 F.3d at 703. Indeed, when we view the facts in the light most favorable to Bryan, as we must at this stage of the proceedings, his conduct does not constitute resistance at all.[13]

**[14]** Two additional considerations militate against finding Officer MacPherson's use of force reasonable. First, it is undisputed that Officer MacPherson failed to warn Bryan that he would be shot with the X26 if he did not comply with the order to remain in his car.[14] We recognized in *Deorle* that police officers normally provide such warnings where feasible, even when the force is less than deadly, and that the failure to give such a warning is a factor to consider. *See* 272 F.3d at 1284; *see also Jackson*, 268 F.3d at 653 (finding that the officer's "safety interest" "increased further when the group was warned by police that a chemical irritant would be used if they did not move back . . . and the group refused to comply"). Here, it was feasible to give a warning that the use of force was imminent if Bryan did not comply. While a warning to Bryan may or may not have caused him to comply, there was "ample time to give that order or warning and no reason whatsoever not to do so." *Deorle*, 272 F.3d at 1284.

**[15]** Second, we have held that police are "required to consider '[w]hat other tactics if any were available' to effect the arrest." *Headwaters*, 240 F.3d at 1204 (quoting *Chew*, 27 F.3d

---

[13]The jury may credit Bryan's testimony that he did not hear the officer's order to remain in the car. The evidence suggests that Bryan thought the officer would again approach from the passenger side of his car and that Bryan turned to face that way. That the officer was instead yards away in the other direction may have prevented Bryan from hearing the commands.

[14]Officer MacPherson now argues that he did warn Bryan. However, Officer MacPherson's own testimony belies this claim. Officer MacPherson has consistently testified that he repeatedly ordered Bryan to remain in his vehicle. This clearly constitutes a command, but it hardly warns him that if he failed to return to his car he would be shot with a taser.

at 1443).[15] Officer MacPherson argues that there were no less intrusive alternatives available to apprehend Bryan. Objectively, however, there were clear, reasonable, and less intrusive alternatives. Officer MacPherson knew additional officers were en route to the scene. He was, or should have been, aware that the arrival of those officers would change the tactical calculus confronting him, likely opening up additional ways to resolve the situation without the need for an intermediate level of force. Thus, while by no means dispositive, that Officer MacPherson did not provide a warning before deploying the X26 and apparently did not consider less intrusive means of effecting Bryan's arrest factor significantly into our *Graham* analysis.

3.   Balancing the Competing Interests

[16] Our review of the *Graham* factors reveals that the government had, at best, a minimal interest in the use of force against Bryan. This interest is insufficient to justify the use of an intermediate level of force against an individual. We are cognizant of the Supreme Court's command to evaluate an officer's actions "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. We also recognize the reality that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 397. This does not mean, however, that a Fourth Amendment violation will be found only in those rare instances where an officer and his attorney are unable to find a sufficient number of compelling adjectives to

---

[15]We do not challenge the settled principle that police officers need not employ the "least intrusive" degree of force possible. *See Gregory v. County of Maui*, 523 F.3d 1103, 1107 (9th Cir. 2008) (citing *Forrester*, 25 F.3d at 807-08). We merely recognize the equally settled principle that officers must *consider* less intrusive methods of effecting the arrest and that the presence of feasible alternatives is a *factor* to include in our analysis.

describe the victim's conduct. Nor does it mean that we can base our analysis on what officers actually felt or believed during an incident. Rather, we must ask if the officers' conduct is " 'objectively reasonable' in light of the facts and circumstances confronting them" without regard for an officer's subjective intentions. *Id.*

**[17]** We thus conclude that the intermediate level of force employed by Officer MacPherson against Bryan was excessive in light of the governmental interests at stake. Bryan never attempted to flee. He was clearly unarmed and was standing, without advancing in any direction, next to his vehicle. Officer MacPherson was standing approximately twenty feet away observing Bryan's stationary, bizarre tantrum with his X26 drawn and charged. Consequently, the objective facts reveal a tense, but static, situation with Officer MacPherson ready to respond to any developments while awaiting backup. Bryan was neither a flight risk, a dangerous felon, nor an immediate threat. Therefore, there was simply "no immediate need to subdue [Bryan]" before Officer MacPherson's fellow officers arrived or less-invasive means were attempted. Deorle, 272 F.3d at 1282; *see also*, *Blankenhorn v. City of Orange*, 485 F.3d 463, 480 (9th Cir. 2007) (" '[I]t is the need for force which is at the heart of the *Graham* factors' " (quoting *Liston v. County of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997))). Officer MacPherson's desire to quickly and decisively end an unusual and tense situation is understandable. His chosen method for doing so violated Bryan's constitutional right to be free from excessive force.

### B. Did Officer MacPherson Violate Bryan's Clearly Established Rights?

**[18]** Having concluded that Officer MacPherson's actions violated Bryan's Fourth Amendment rights, we next must ask whether his conduct "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818

(1982). If an officer's use of force was "premised on a *reasonable* belief that such force was lawful," the officer will be granted immunity from suit, notwithstanding the fact excessive force was deployed. *Deorle*, 272 F.3d at 1285; *see also Saucier*, 533 U.S. at 202 (asserting that the qualified immunity analysis asks "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted"). We must, therefore, turn to the state of the law at the time Officer MacPherson tasered Bryan to determine whether Officer MacPherson reasonably could have believed his use of the taser against Bryan was constitutional. *See Saucier*, 533 U.S. at 202.

**[19]** All of the factors articulated in *Graham*—along with our recent applications of *Graham* in *Deorle* and *Headwaters*—placed Officer MacPherson on fair notice that an intermediate level of force was unjustified. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008) ("Considering that under Fogarty's version of events each of the *Graham* factors lines up in his favor, this case is not so close that our precedents would fail to portend the constitutional unreasonableness of defendants' alleged actions."); *Boyd v. Benton County*, 374 F.3d 773, 781 (9th Cir. 2004) (asking whether "a reasonable officer would have had fair notice that the force employed was unlawful"). Officer MacPherson stopped Bryan for the most minor of offenses. There was no reasonable basis to conclude that Bryan was armed. He was twenty feet away and did not physically confront the officer. The facts suggest that Bryan was not even facing Officer MacPherson when he was shot. A reasonable officer in these circumstances would have known that it was unreasonable to deploy intermediate force.

**[20]** We do not need to find closely analogous case law to show that a right is clearly established. *Moreno v. Baca*, 431 F.3d 633, 641 (9th Cir. 2005); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual

circumstances."); *Oliver*, 586 F.3d at 907 (finding that a right can be clearly established where the officer's conduct "lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [the officer], notwithstanding the lack of fact-specific case law"). However, as of July 24, 2005, there was no Supreme Court decision or decision of our court addressing whether the use of a taser, such as the Taser X26, in dart mode constituted an intermediate level of force. Indeed, before that date, the only statement we had made regarding tasers in a published opinion was that they were among the "variety of non-lethal 'pain compliance' weapons used by police forces." *San Jose Charter of Hells Angels Motorcycle Club*, 402 F.3d at 969 n.8. And, as the Eighth Circuit has noted, "[t]he Taser is a relatively new implement of force, and case law related to the Taser is developing." *Brown v. City of Golden Valley*, 574 F.3d 491, 498 n.5 (8th Cir. 2009). Two other panels have recently, in cases involving different circumstances, concluded that the law regarding tasers is not sufficiently clearly established to warrant denying officers qualified immunity. *Mattos v. Agarano*, 590 F.3d 1082, 1089-90 (9th Cir. 2010); *Brooks v. City of Seattle*, 599 F.3d 1018, 1031 n.18 (9th Cir. 2010).

**[21]** Based on these recent statements regarding the use of tasers, and the dearth of prior authority, we must conclude that a reasonable officer in Officer MacPherson's position could have made a reasonable mistake of law regarding the constitutionality of the taser use in the circumstances Officer MacPherson confronted in July 2005. Accordingly, Officer MacPherson is entitled to qualified immunity. *See Ctr. for Bio-Ethical Reform v. Los Angeles County Sheriff Dept.*, 533 F.3d 780, 794 (9th Cir. 2008).

## CONCLUSION

Viewing the facts, as we must, in the light most favorable to Bryan, we conclude, for the purposes of summary judg-

ment, that Officer MacPherson used unconstitutionally excessive force. However, a reasonable officer confronting the circumstances faced by Officer MacPherson on July 24, 2005, could have made a reasonable mistake of law in believing the use of the taser was reasonable. Accordingly we **REVERSE** the district court's denial of summary judgment on the basis of qualified immunity.

**REVERSED.**