**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

TROY MATTOS; JAYZEL MATTOS,
        *Plaintiffs-Appellees,*

    v.

DARREN AGARANO; RYAN AIKALA;
STUART KUNIOKA; HALAYUDHA
MACKNIGHT,
        *Defendants-Appellants,*

    and

MAUI COUNTY,
        *Defendant.*

No. 08-15567

D.C. No.
07-CV-00220-DAE

OPINION

Appeal from the United States District Court
for the District of Hawaii
David A. Ezra, District Judge, Presiding

Argued and Submitted
May 15, 2009—Honolulu, Hawaii

Filed January 12, 2010

Before: Alex Kozinski, Chief Judge, Jay S. Bybee and
Consuelo M. Callahan, Circuit Judges.

Per Curiam Opinion

871

## COUNSEL

Brian T. Moto, Corporation Counsel for the County of Maui, Laureen L. Martin (argued), Moana M. Lutey, Richard B. Rost, Cheryl Tipton, Deputies Corporation Counsel, Wailuku, Hawaii, for the defendants-appellants.

Eric A. Seitz (argued), Lawrence I. Kawasaki, Honolulu, Hawaii, for the plaintiffs-appellees.

**OPINION**

PER CURIAM:

Maui police officers Darren Agarano, Halayudha Mac-Knight, Stuart Kunioka, and Ryan Aikala appeal the district court's order denying their motion for summary judgment on the basis of qualified immunity in this § 1983 action. The district court ruled that material questions of fact existed as to whether the officers' use of a Taser gun ("Taser") against plaintiff Jayzel Mattos was constitutionally reasonable and summary judgment was therefore inappropriate. Because we conclude that, even taking the facts in the light most favorable to the plaintiffs, the defendant officers did not violate Jayzel's constitutional rights, we reverse the judgment of the district court.

## I.   FACTS AND PROCEDURAL HISTORY

On August 23, 2006, sometime after 11 p.m., a domestic disturbance broke out between Jayzel and Troy Mattos at their home. During the fight, Jayzel asked her fourteen-year-old daughter, Cheynice, to call the police. Cheynice told the dispatcher that Jayzel and Troy were engaged in a physical altercation and that things were being thrown around. Officers Agarano, MacKnight, Kunioka, and Aikala responded to the 911 call. When the officers arrived, they found Troy, a six-foot-three-inch tall man weighing approximately 200 pounds, sitting at the top of the stairs just outside the front door of a second story residence with two bottles of beer lying nearby. Based on the beer bottles and the smell of alcohol, Officer Kunioka believed that Troy was intoxicated. When Kunioka approached and asked Troy what had happened, Troy responded that he and his wife had argued but that the argument had not gotten physical. Kunioka asked Troy to get Jayzel so that they could talk to her and make sure she was safe.

The parties differ in their accounts of what follows, but at this stage of the litigation, we take the facts in the light most

favorable to the plaintiffs. *See Smith v. City of Hemet*, 394 F.3d 689, 693 (9th Cir. 2005) (en banc).

Troy entered his home to get Jayzel, and Officer Agarano stepped inside the doorway. When Troy returned with Jayzel, Troy became upset that Agarano was in his house, and he demanded that the officers leave, insisting that they had no right to be in the house and yelling profanities at them. The officers asked Jayzel to speak to them outside. Jayzel agreed and asked her husband and the officers to calm down and not wake her sleeping children. Aikala then entered the hallway area to arrest Troy, who was still yelling at the officers. Jayzel asked Aikala why her husband was being arrested and again asked that the officers and her husband calm down, leave the house, and not disturb her children.

At this point, Jayzel was cornered between the officers and her husband—Officer Agarano was in front of her, Officer Aikala was at her right, and her back was against her husband's chest. Aikala moved to apprehend Troy and bumped against Jayzel. Feeling uncomfortable and exposed with Aikala squarely in front of her, Jayzel raised her hands, palms forward at her chest, to "keep [Aikala] from flushing his body against [hers]." Jayzel agrees that both of her hands touched Aikala's chest, but asserts that she did not put her hands up until Aikala was pressed up against her.

Aikala immediately stepped back and asked Jayzel if she was touching an officer. Jayzel testified that she was scared and again implored everyone to calm down and not wake her children. At that moment, Jayzel felt a pinch on the back of her right hand and then felt "an incredible burning and painful feeling locking all of [her] joints," she heard herself scream, and felt herself fall to the floor. Aikala had tased Jayzel and cycled it for five seconds.

Jayzel and Troy were taken into custody; both were charged with harassment, while Troy was charged with resist-

ing arrest and Jayzel with obstructing government operations. A state court judge dismissed the charges against Jayzel, and it appears that the State later dropped all criminal charges against Troy.

Troy and Jayzel brought suit against the officers and others under 42 U.S.C. § 1983 for violations of their Fourth, Fifth, and Fourteenth Amendment rights based on the officers' warrantless entry into their residence, Jayzel and Troy's arrests, and the officers' use of the Taser on Jayzel. The district court granted summary judgment in favor of the defendants on all claims except an excessive force claim under the Fourth Amendment based on the officers' use of the Taser on Jayzel. With respect to excessive force, the court ruled that there were questions of fact material to deciding whether the use of the Taser was constitutionally reasonable. The officers brought this appeal.

## II.   ANALYSIS

It is well-settled that the party moving for summary judgment has the initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986). Once the moving party has met this initial burden, the nonmoving party has the subsequent burden of presenting evidence to show that a genuine issue of fact remains. The party opposing the motion for summary judgment "may not rest upon the mere allegations or denials of [her] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 248. If the party opposing the motion "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" then summary judgment is proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Once the officers moved for summary judgment as a matter of law, presenting evidence that the use of a Taser was not

excessive force under the Fourth Amendment and that a reasonable officer would not have known that a Taser deployment in this situation would violate the Fourth Amendment, the Mattoses could not defeat summary judgment by relying on conclusory allegations in their pleading. They had the burden to come forward with specific facts—such as the force used in a deployment of a Taser or the injuries Jayzel suffered —to show that the officers' use of a Taser was indeed a violation of the Fourth Amendment. Despite the Mattoses failure to offer additional evidence to defeat summary judgment, we view the submitted evidence in the light most favorable to the Mattoses in determining whether there are genuine issues of material fact in their § 1983 claim. *See Bingham v. City of Manhattan Beach*, 341 F.3d 939, 945 (9th Cir. 2003).

**[1]** In evaluating a § 1983 claim against an officer, we generally proceed in a two-part analysis. The "threshold question" is "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (abrogated in part on other grounds by *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009)). If the Constitution was not violated, that is the end of the inquiry. If there was a violation, however, we proceed to the question of qualified immunity. Officers are protected by qualified immunity, which is "an immunity from suit rather than a mere defense to liability," *Pearson* 129 S.Ct. at 815. When an officer asserts immunity, the court dismisses the case unless the officer knew that his conduct was "clearly unlawful," that is, unless the officer understood or should have understood that his actions violated a clearly established right. *Saucier*, 533 U.S. at 202. Although we have flexibility in deciding which part of the analysis to address first, we think it important in this case to determine first whether a constitutional violation occurred. *See Pearson*, 129 S.Ct. at 818 (holding that "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory").

## A.   *Constitutional Violation*

Although we find the question to be a close one, on this record, we cannot conclude that the officers used excessive force in violation of the Fourth Amendment.

**[2]** The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures" U.S. CONST. amend. IV. When a plaintiff claims that she was not "secure in [her] person" because law enforcement officers used excessive and, therefore, "unreasonable" force in the course of an arrest, we balance " 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against 'the countervailing government interests at stake.' " *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). We have held that we conduct this inquiry in a three-step analysis. "First, we assess the gravity of the particular intrusion on Fourth Amendment interests by evaluating the type and amount of force inflicted." *Id.* Second, we analyze "the importance of the government interests at stake by evaluating: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Id.* At this stage of the analysis, we may also consider other factors, such as "the availability of alternative methods of capturing or subduing a suspect." *Smith*, 394 F.3d at 701. Finally, we weigh the gravity of the intrusion against the government's interest to determine whether the force used was constitutionally reasonable. *Miller*, 340 F.3d at 964.

1

We first evaluate the type and amount of force inflicted. The problem here is that, even with the benefit of some briefing and argument on the subject, it is difficult for us to opine with confidence regarding either the quantum of force

involved in a deployment of a Taser gun or the type of force inflicted. The defendants paint a benign portrait of the Taser, offering evidence that it has been used on over one million human subjects and has proven extremely safe, as well as evidence that the actual voltage applied to a subject's body uses less electricity than a single bulb on a string of Christmas tree lights.[1]

**[3]** The plaintiffs, for their part, have not offered any evidence about the kind of force or injury a Taser inflicts. Nor have they provided evidence that would permit us to assess the severity of any injuries Jayzel suffered from the Taser. Jayzel described the experience as "[i]ncredibly painful," "last[ing] for what seemed like forever," and analogized the pain to child labor. But although she claims to have suffered injuries as a result of the incident, the plaintiffs have not offered any evidence of these injuries; Jayzel removed the Taser's prongs herself and then refused medical treatment at the scene.

**[4]** On the other hand, the defendant's expert conceded that a Taser in the drive stun mode "induce[s] subject control through pain compliance if the person responds to painful stimulus," and that it "stimulates nerves that control the motor muscles which . . . result[s] in subject incapacitation." On this record then, we are left with evidence that the Taser, in general, is more than a non-serious or trivial use of force but less than deadly force. Unfortunately, there is a lot of room between these end points. In this case, we know that the Taser was sufficient force to drive Jayzel to her knees in seconds and cause her to scream with pain. Although the record on this point is not as developed as we could hope for, viewing the evidence in the light most favorable to Jayzel, we have no difficulty concluding that the Taser stun was a serious intrusion into the core of the interests protected by the Fourth

---

[1]This testimony, however, may advise that we be more careful with our Christmas tree lights than describe the harmlessness of a Taser stun.

Amendment: the right to be "secure in [our] persons." U.S. CONST. amend. IV.

2

**[5]** We next analyze the importance of the government interest in using a Taser and weigh the gravity of the intrusion against the government interest. *Miller*, 340 F.3d at 964. First, we consider the severity of the crime. When Aikala announced that Troy was under arrest, Jayzel was between the officers and her husband. She did not move from her protective position, asking why Troy was under arrest and requesting that the officers proceed outside. Aikala reached for Troy and made contact with Jayzel. When Aikala immediately asked her if she was touching an officer, Jayzel did not directly respond nor did she move from her position but instead asked him to calm down and be quiet because her children were sleeping. It was at this point that Aikala deployed the Taser on Jayzel, and the other officers arrested Troy. In the light most favorable to Jayzel, her actions in obstructing the officers, although inappropriate, did not constitute a serious crime. Her contact with Aikala appears to have been incidental and due mainly to the cramped quarters in which the Mattoses and the officers found themselves rather than to any intention on Jayzel's part to interfere with the officers. Additionally, however, we must take into account Troy's actions. He was belligerent and appeared to be intoxicated. As explained by the 911 call, Troy's conduct that evening was a threat to Jayzel, and in his intoxicated condition, Troy posed a threat to the officers as well. Thus, Jayzel herself may have posed little threat, but any interference she caused only heightened the danger Troy represented. As the district court found, Jayzel's actions "exacerbated an already tense, and rapidly escalating situation." On balance then, Jayzel's actions were not a serious crime, but as we discuss below, carried the potential for a far more serious crime— assault on an officer.

The second factor we consider in evaluating the government interest is the threat to the officers' safety. We view the officers' safety as "the most important of the three *Graham* factors." *Miller,* 340 F.3d at 964. Here, the officers were called to respond to a fourteen-year-old girl's 911 call reporting domestic violence. We have observed that "[t]he volatility of situations involving domestic violence" makes them particularly dangerous. *United States v. Martinez,* 406 F.3d 1160, 1164 (9th Cir. 2005) "When officers respond to a domestic abuse call, they understand that violence may be lurking and explode with little warning. Indeed, more officers are killed or injured on domestic violence calls than on any other type of call." *Id.* (internal citations and quotation marks omitted)*; see also United States v. Black*, 482 F.3d 1035, 1040 (9th Cir. 2007) ("Our circuit has recognized that the exigencies of domestic abuse cases present dangers that . . . may override considerations of privacy.") (internal citations omitted). While a drunken Troy screamed profanities at the police, Jayzel repeatedly asked that the officers exit the house even though, as the district court found, they had probable cause to enter the residence. When the officers moved to arrest Troy, Jayzel made contact with Aikala. Although Jayzel's actions may have been well-intentioned, or even innocent, they came precisely when the officers moved to arrest Troy. Aikala then tased Jayzel, and the other officers arrested Troy.

**[6]** In assessing the danger the police confronted, we keep in mind the Supreme Court's guidance in *Graham v. Connor*, 490 U.S. 386 (1989):

> The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . [P]olice officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.* at 396-97. Thus, we must take account of the circumstances as they were for the officers at the Mattoses' residence on that night. Given the dangerous nature of domestic violence situations, the close quarters in which the officers and the Mattoses were contained, Troy's intoxicated state, and the contact made between Jayzel and Aikala, there was the risk of immediate threat to the safety of the officers. This factor weighs heavily in favor of the government.

**[7]** Third, we consider whether the "suspect was actively resisting arrest or attempting to evade arrest by flight." *Miller*, 340 F.3d at 964. Jayzel's actions prevented the officers from arresting Troy. She was in front of her husband and demanded to know why he was being arrested. She made contact with Aikala as he tried to reach across her to apprehend Troy. Her actions prevented the officers from arresting Troy, and the officers could use reasonable force to move her away from the arrest. Although there may have been alternative methods of forcefully moving Jayzel out of the way, officers are not required to use the least amount of force necessary. *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994) ("Requiring officers to find and choose the least intrusive alternative would require them to exercise superhuman judgment. . . . Imposing such a requirement . . . would . . . entangle the courts in endless second-guessing of police decisions made under stress and subject to the exigencies of the moment."). This factor also weighs in the government's favor. This combination of the severity of the crime, the threat to the officers, and the magnitude of the resistence tips decisively in the officers' favor. This was potentially an explosive situation. With all of the participants in close contact in a small room, there was real danger that if Troy could not be subdued then someone— including Jayzel—might be injured. In such circumstances, the officers had an important interest in obtaining immediate control.

3

**[8]** Finally, in weighing the gravity of the Fourth Amendment intrusion against the government's interest, we conclude

that the force used against Jayzel was reasonable within the meaning of the Fourth Amendment. Even though we find that use of a Taser represents a serious intrusion on interests protected by the Fourth Amendment, we recognize that in responding to a domestic violence call, the officers confronted a dangerous and volatile situation. When an intoxicated Troy began yelling profanities at the officers and demanding that they leave, the officers felt the need to arrest him to finish their investigation and diffuse the situation. Because Jayzel interfered with Troy's arrest and, in doing so, made contact with Aikala, Aikala was justified in removing her from Troy's side. Although an alternative method of force may have been advisable, the Fourth Amendment does not require an officer to use the minimum amount of force necessary to move Jayzel and arrest Troy. *See, e.g.*, *Bryan v. McPherson*, ___ F.3d ___, No. 08-55622, slip op. at 16752 n.15 (9th Cir. Dec. 28, 2009). In this heated situation, Aikala's deployment of a Taser did not violate Jayzel's constitutional rights.

B.   *Qualified Immunity*

**[9]** Even if we thought that the officers used excessive force, it would not have been clear to any reasonable officer on August 23, 2006, that use of a Taser in the situation they confronted was constitutionally impermissible. The doctrine of qualified immunity shields the officers "from liability for civil damages [unless their conduct violated] clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A right is "clearly established" if " 'it would be clear to a reasonable officer that his conduct was unlawful *in the situation he confronted*.' " *Wilkins v. City of Oakland*, 350 F.3d 949, 954 (9th Cir. 2003) (emphasis in original) (quoting *Saucier*, 533 U.S. at 202). An officer will therefore be entitled to qualified immunity even if he was mistaken in his belief that his conduct was lawful, so long as that belief was reasonable. *Id.* at 955.

In determining whether a right is clearly established, we begin our analysis by looking to binding precedent from our circuit and from the Supreme Court. *Boyd v. Benton County*, 374 F.3d 773, 781 (9th Cir. 2004). In the absence of precedent, we may also "look to whatever decisional law is available to ascertain whether the law is clearly established for qualified immunity purposes, including decisions of state courts, other circuits, and district courts." *Id.* (internal quotation marks omitted).

Before August 23, 2006, when the confrontation occurred, neither our circuit nor the Supreme Court had decided an excessive force case involving the use of a Taser; in fact, only the Sixth, Tenth, and Eleventh Circuits even addressed such cases. *See Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004); *Hinton v. City of Elwood, Kansas*, 997 F.2d 774, 781-82 (10th Cir. 1993); *Russo v. City of Cincinnati*, 953 F.2d 1036, 1044-45 (6th Cir. 1992). In all three cases, the courts held that the use of a Taser was constitutionally permissible. We note, however, that the Eleventh Circuit has recently rejected qualified immunity for officers who used a Taser to shock a man (who appeared mentally unstable) eight to twelve times before making any attempt to arrest him. *Oliver v. Fiorino*, ___ F.3d ___, No. 08-15081 (11th Cir. Oct. 26, 2009). The court found that although the initial use of the Taser may have been justified, the officers' repeated use of the Taser was unreasonable and excessive under the Fourth Amendment. *Id.* The court explained that a reasonable officer would have recognized that his actions were a grossly disproportionate response to the threat posed. *Id.* More recently, in *Bryan v. McPherson*, ___ F.3d___, No. 08-55622 (9th Cir. Dec. 28, 2009), we rejected qualified immunity for an officer who used a Taser on a driver during a traffic stop for a seatbelt infraction. The driver stepped out of the vehicle in an agitated state, wearing nothing but his boxer shorts and tennis shoes, yelling gibberish, and hitting his thighs, when the officer, who was standing twenty-five feet away from the driver, deployed his Taser without warning. The driver fell face first

into the ground, fracturing four teeth and suffering facial contusions. We determined that even though the driver's behavior was bizarre, it posed no threat to the officer and did not indicate that the driver was attempting to flee. We denied the officer qualified immunity, holding that his use of force was excessive and unreasonable.

**[10]** Unlike *Bryan* or *Oliver*, this is simply not a case in which the officers' conduct was so "patently violative" of Jayzel Mattos's constitutional rights "that reasonable officials would know without guidance from the courts that the action was unconstitutional." *Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir. 1994) (internal quotation marks omitted). The officers used the Taser only once in a domestic violence situation that could have quickly become much more dangerous to everyone involved. Because claims of excessive force are analyzed under a Fourth Amendment reasonableness standard using the factors delineated by the Supreme Court in *Graham v. Connor*, 490 U.S. 386, 396 (1996), nothing in our opinion today prevents another panel from deciding, with the benefit of a more complete and substantial evidentiary record than the one we have in this case, that the use of a Taser constituted excessive force. *See Bryan*, ___ F.3d___, No. 08-55622.

## III.   CONCLUSION

**[11]** The Mattoses failed to offer specific facts that would establish the existence of an element essential to their case—namely, that the force used was constitutionally unreasonable. We hold that the use of a Taser gun under these circumstances did not violate the Fourth Amendment.

REVERSED AND REMANDED.