**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 12-2076**

_____

STEVEN WAYNE THOMAS,

Plaintiff - Appellee.

v.

R. V. HOLLY, individually; MARK MELTON, individually; M. D. SMITH, individually; KEN GILSTRAP, individually; JUSTIN MATTHEWS, individually; DON LLOYD, individually; DARIN SMITH, individually; CLINT BABB, individually; C. B. ESTES, individually; BRYAN ALLEN, individually; BILL MARCUM, individually; SHERIFF TRACY CARTER, individually and in his official capacity as Lee County Sheriff,

Defendants - Appellants,

and

PABLO MORA, individually; JOHN DOE 15, individually; JOHN DOE 14, individually; JOHN DOE 13, individually; JOHN DOE 12, individually; JOHN DOE 11, individually; JOHN DOE 10, individually; JOHN DOE 9, individually; JOHN DOE 8, individually; JOHN DOE 7, individually; JOHN DOE 6, individually; JOHN DOE 5, individually; JOHN DOE 4, individually and in his official capacity as a Corrections Officer for the North Carolina Department of Corrections; JOHN DOE 3, individually and in his official capacity as a Corrections Officer for the North Carolina Department of Corrections; JOHN DOE 2, individually and in his official capacity as a Corrections Officer for the North Carolina Department of Corrections; JOHN DOE 1, individually and in his official capacity as a Corrections Officer for the North Carolina Department of Corrections; GERALD BRANKER, in his official capacity as Administrator for Central Prison, North Carolina Department of Corrections; NURSE DOE; NORTH CAROLINA DEPARTMENT OF CORRECTIONS; LEE COUNTY SHERIFF'S DEPARTMENT; LEE COUNTY, NORTH CAROLINA; DEFENDANTS YET TO BE IDENTIFIED, individually;

NURSE DOE, individually and in her official capacity as a Nurse for Central Prison, North Carolina Department of Correction,

Defendants.

---

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. Terrence W. Boyle, District Judge. (5:10-cv-00052-BO)

---

Argued: May 15, 2013          Decided: July 17, 2013

---

Before NIEMEYER and KEENAN, Circuit Judges, and HAMILTON, Senior Circuit Judge.

---

Affirmed in part; vacated and remanded in part by unpublished per curiam opinion.

---

**ARGUED**: Bradley O. Wood, WOMBLE CARLYLE SANDRIDGE & RICE, PLLC, Winston-Salem, North Carolina, for Appellants. Edward Hardy Lewis, BLANCHARD, JENKINS, MILLER, LEWIS & STYERS, PA, Raleigh, North Carolina, for Appellee. **ON BRIEF**: James R. Morgan, Jr., WOMBLE CARLYLE SANDRIDGE & RICE, PLLC, Winston-Salem, North Carolina, for Appellants. Kieran J. Shanahan, Brandon S. Neuman, John E. Branch, III, SHANAHAN LAW GROUP, PLLC, Raleigh, North Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

- 2 -

PER CURIAM:

In this action brought pursuant to 42 U.S.C. § 1983, ten officers of the Lee County, North Carolina Sheriff's Department appeal the district court's denial of their respective motions for summary judgment asserting qualified immunity. Four of these same officers plus one additional officer appeal the district court's denial of their respective motions for summary judgment asserting public officer immunity in regard to a related claim under North Carolina common law. We affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

I

A

Given the procedural posture of this case, the facts are set forth by viewing the evidence in the record and drawing all reasonable inferences therefrom in the light most favorable to the plaintiff, as the nonmoving party. Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

At approximately 2:13 p.m. on April 27, 2009, Deputy Justin Matthews (Deputy Matthews) of the Lee County, North Carolina Sheriff's Department (the Sheriff's Department) responded to a radio dispatch call reporting "two white males damaging property" at the rural intersection of St. Andrews Church Road

- 3 -

and Meadowview Road, near Sanford, North Carolina.  (J.A. 3376).

The intersection is located in Deputy Matthews' normal patrol area.

As he arrived at the scene in his patrol car, Deputy Matthews ran over part of an address sign lying in the road; such sign presumably a casualty of the reported property destruction.  Deputy Matthews pulled up his patrol car behind a pickup truck parked partially on the roadway of Meadowview Road because he saw two unknown white men standing beside the truck in a grassy area.  Prior to exiting his patrol car, Deputy Matthews radioed in his location and the truck's license plate number to the Sheriff's Department.

Deputy Matthews is approximately five-feet, eight inches tall and weighs approximately 215 pounds.  Steven Wayne Thomas (Plaintiff), one of the two white men spotted by Deputy Matthews, is approximately five-feet, ten inches tall and weighs approximately 210 pounds.  Josh Gross (Gross), the other white man spotted by Deputy Matthews, is approximately six-feet, one-inch tall and weighs approximately 265 pounds.

After seeing Deputy Matthews arrive on the scene, Plaintiff walked around to the back quarter panel of the driver's side of Deputy Matthews' patrol car.  By this time, Deputy Matthews had exited his patrol car, leaving his driver's side door open, and had started talking with Gross.  Deputy Matthews asked Gross in

a calm manner something along the lines of "[W]hat's going on here? What's the problem?" (J.A. 1145). Identifying Plaintiff as his friend, Gross responded that Plaintiff was having troubles, that Plaintiff had lost his mind, that something was wrong with Plaintiff, and that Plaintiff needed help. At all times relevant to this case, Plaintiff and Gross were unarmed.

As Plaintiff approached Deputy Matthews on the driver's side of his patrol car, Plaintiff held his hands up in front of his face with his palms turned outward. Plaintiff continued to approach Deputy Matthews until he got within an arm's length of Deputy Matthews and told him: "'Sir, I have lost my mind[.]'" (J.A. 1529). At this point, Deputy Matthews extended his arm to push Plaintiff backward in order to obtain a reactionary gap between them while saying "'Back the f*ck up.'" (J.A. 1531). Plaintiff immediately approached Deputy Matthews again, getting within an arm's length of Deputy Matthews for a second time. Deputy Matthews, for a second time, pushed Plaintiff backward. Undeterred, Plaintiff approached Deputy Matthews a third time, getting within an arm's length of Deputy Matthews for a third time.

At this point, Deputy Matthews felt Plaintiff had pinned him in between his open driver's side door and his patrol car. Accordingly, Deputy Matthews drew his taser, pointed it at Plaintiff, and yelled at him three times to get down on the

- 5 -

ground.    Seeing the situation unfold, Gross told Plaintiff:
"'Wayne, he's going to shock you.  He's going to shock you.  Get
on the ground.  He's going to shock you.'"  (J.A. 1541).

Instead of complying with Deputy Matthews' command to get
down on the ground, Plaintiff started backing up and turning
clockwise away from Deputy Matthews.  With his taser set in
probe mode, Deputy Matthews activated his taser, causing two
thin wires approximately seven feet long with metal prongs on
each end to shoot out of the taser and into Plaintiff's mid-back
near his left shoulder blade, delivering a five second cycle of
electrical shock to Plaintiff's body "designed to cause
electro-muscular disruption, effectively freezing" Plaintiff's
"muscles and thereby temporarily disabling him."   Meyers v.
Baltimore County, Md., 713 F.3d 723, 728 n.3 (4th Cir. 2013).
By this time, Plaintiff and Deputy Matthews were at the rear of
Deputy Matthews' patrol car.  Once tased, Plaintiff fell to the
ground and asked Deputy Matthews not to tase him again.

Through the radio microphone on Deputy Matthews' lapel,
Deputy Matthews immediately advised a dispatcher at the
Sheriff's Department and Deputy Ken Gilstrap (Deputy Gilstrap),
who was on route to the scene, that he had deployed his taser.
Deputy Matthews continued to command Plaintiff to stay on the
ground.  Plaintiff ignored those commands and tried to get up in
order to get away.  Once Plaintiff got to his hands and knees,

- 6 -

Deputy Matthews tased him for a second time, thereby shocking Plaintiff for another five seconds. Although Plaintiff fell to the ground on his back, he started to get up again. Deputy Matthews responded by tasing Plaintiff a third time (another five seconds), which dropped Plaintiff to the ground again. Plaintiff, having now figured out the function of the wire leads embedded in his back, reached back and broke off the wire leads.

Deputy Matthews continued to command Plaintiff to stay on the ground. Refusing to comply, Plaintiff stood up. With the probe mode of his taser inoperable, Deputy Matthews attempted to gain control of Plaintiff by pepper spraying him in the face.

Immediately after being pepper sprayed, Plaintiff turned away from Deputy Matthews and ran approximately the length of a football field, crossing St. Andrews Church Road along the way. Plaintiff exhibited no reaction to being pepper sprayed. Deputy Matthews pursued Plaintiff across the road on foot. While in pursuit of Plaintiff, Deputy Matthews used his lapel microphone to report in to dispatch that the subject had disabled his taser and that he was in pursuit of him on foot.

In the meantime, Gross flagged down Deputy Gilstrap and pointed him in the direction of the chase. Gross also crossed the road and repeatedly called to Plaintiff to come back and stop running. Hearing Gross' voice from approximately fifty-feet away, Plaintiff made a u-turn and started running

straight toward Gross' voice like he'd been "shot . . . out of a gun." (J.A. 1165). Deputy Matthews followed Plaintiff pretty close behind. When Plaintiff neared Gross, Gross tackled him to the ground in a football style tackle, got on his back, and started telling him that everything would be alright.

By this time, Deputy Matthews had caught up with Plaintiff and had his handcuffs out. Once Deputy Matthews got the handcuffs near Plaintiff's right arm, Gross clicked one handcuff on that arm. Gross then grabbed Plaintiff's left arm and got it behind his back. At this point, Deputy Matthews told Gross to back up and get out of the way. As Gross complied, Deputy Matthews got on Plaintiff's back and got a hold of Plaintiff's handcuffed arm. Plaintiff's face was to the ground, and although he was moving his body in a squirming manner, he did not try to get up or fight back.

By this time, Deputy Gilstrap had arrived on the scene. Deputy Gilstrap tased Plaintiff three times for five seconds each time in prong mode within the course of a minute and then joined Matthews in holding Plaintiff on the ground by sitting on one side of Plaintiff's buttocks and his corresponding leg. Deputy Gilstrap weighs approximately 185 pounds.

Gross, who was standing in front of Plaintiff at this point, then witnessed Detective Clinton Babb (Detective Babb), who had recently arrived on the scene, punch Plaintiff in the

back of his head four or five times in rapid succession with a closed fist and with great force. When Gross called for Detective Babb to stop hitting Plaintiff, Detective Babb jumped up, got in Gross' face and told him to "'Back the f*ck up! Back the f*ck up!'" (J.A. 1176).

Deputy Sheriff Brian Estes (Deputy Estes), who had also recently arrived on the scene, then got down on the ground by Plaintiff and struck him in the left side of his face several times with great force with his knee.[1] Detective Sergeant William Marcum (Detective Sergeant Marcum) subsequently walked Gross across the street.

Deputy Gilstrap took over control of Plaintiff's handcuffed arm, while another officer, Detective R.V. Holly (Detective Holly), got on top of Plaintiff near his shoulders and put his knee between Plaintiff's shoulder blades in an attempt to handcuff his free arm. Detective Babb then tased Plaintiff four more times for five second cycles within one and a half minutes. This time, however, the taser was set in stun mode. Stun mode is used for pain compliance rather than to physically incapacitate the subject. In stun mode, the electrical shock is delivered through the electrodes of the taser device being

---

[1] Plaintiff's expert witness regarding the appropriate use of force opined that Detective Babb's punches and Deputy Estes' knee strikes constituted the use of deadly force.

applied directly to the subject's skin rather than through electrical wires.

While Plaintiff remained on the ground with three officers still on top of him, Plaintiff's other arm was successfully handcuffed with a second set of handcuffs which were linked together with the first set secured on his other arm. Once Plaintiff was fully handcuffed, everyone stood up but Plaintiff. Deputy Matthews then advised the dispatcher to call an ambulance. Plaintiff's ankles were then shackled, at which point, Plaintiff sat up. Officers asked Plaintiff to stand up but he refused. Eventually, some officers got Plaintiff to his feet and helped him walk to a waiting ambulance which transported Plaintiff to the hospital for emergency medical care. Five additional law enforcement officers arrived on the scene at various times, but none were involved in attempting to arrest or subdue Plaintiff.

Based upon reasonable inferences from the record, a reasonable jury could find that, as the direct result of the just described incident, Plaintiff suffered a fractured jaw requiring surgery and suffered significant damage to the root of a tooth. All parties involved later learned that Plaintiff's erratic behavior was caused by his exposure to herbicides and insecticides that he mixed together in order to spray on tobacco plants at his nearby farm.

Of relevance on appeal, Plaintiff brought the present action against eleven defendants. The claims at issue on appeal are: (1) § 1983 excessive force claims against Deputy Matthews, Deputy Gilstrap, Detective Babb, and Deputy Estes in their individual capacities (collectively the Excessive Force Defendants); (2) § 1983 bystander liability claims against Sheriff Tracy Carter (Sheriff Carter), Sergeant Darin Smith (Sergeant Smith), Deputy Mark Melton (Deputy Melton), Deputy Don Lloyd (Deputy Lloyd), Detective Sergeant Marcum, and Lieutenant Bryan Allen (Lieutenant Allen) in their individual capacities (collectively the Bystander Defendants); and (3) state-law assault and battery claims against Deputy Matthews, Deputy Gilstrap, Deputy Estes, Detective Babb, and Detective Holly in their individual capacities (collectively the Assault and Battery Defendants). Plaintiff seeks compensatory and punitive damages.

All of the § 1983 defendants moved for summary judgment on the basis of qualified immunity. Additionally, the Assault and Battery Defendants moved for summary judgment with respect to Plaintiff's assault and battery claims on the basis of North Carolina's doctrine of public officer immunity.

In a written order, the district court denied all of these motions for summary judgment in toto. This timely appeal followed.

II

The Excessive Force Defendants contend they are respectively entitled to qualified immunity from Plaintiff's claims alleging each used excessive force in seizing him in violation of his right to be free from unreasonable seizures of his person under the Fourth Amendment, U.S. Const. amend. IV, and therefore, the district court erred by denying their respective motions for summary judgment asserting qualified immunity. We review the district court's denials of such motions de novo, construing the facts in the light most favorable to the non-moving party, here Plaintiff. Orem v. Rephann, 523 F.3d 442, 445 (4th Cir. 2008).

As is relevant here, under the doctrine of qualified immunity, law enforcement officers performing discretionary duties "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). This sets up the following two-pronged inquiry: (1) Did a constitutional or statutory violation occur?; and (2) If so, was

the right violated clearly established at the time of the officer's conduct? Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled in part by Pearson v. Callahan, 555 U.S. 223 (2009); Evans v. Chalmers, 703 F.3d 636, 646 (4th Cir. 2012). We have discretion to determine which prong "should be addressed first in light of the circumstances in the particular case at hand." Pearson, 555 U.S. at 236.

With respect to each Excessive Force Defendant, the first prong asks whether he violated Plaintiff's right to be free of "seizures effectuated by excessive force." Schultz v. Braga, 455 F.3d 470, 476 (4th Cir. 2006). In answering this question, we employ a standard of objective reasonableness, testing whether the officer's actions are objectively reasonable in light of the facts and circumstances confronting him. Scott v. Harris, 550 U.S. 372, 381 (2007); Graham v. Connor, 490 U.S. 386, 397 (1989). The subjective intent or motivation of the officer is irrelevant. Graham, 490 U.S. at 397. In assessing the objective reasonableness of the force used, "a court must focus on the moment that the force is employed," Henry, 652 F.3d at 531, in light of the totality of the circumstances, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, . . . whether he is actively resisting arrest or attempting to evade arrest by flight," Graham, 490 U.S. at 396,

and "[t]he extent of the plaintiff's injury," Jones v. Buchanan, 325 F.3d 520, 527 (4th Cir. 2003). Moreover, "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." Waterman v. Batton, 393 F.3d 471, 481 (4th Cir. 2005). As we have previously cautioned, "[t]he calculus of reasonableness must embody allowances for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain and rapidly evolving—about the amount of force that is necessary in a particular situation." Park v. Shiflett, 250 F.3d 843, 853 (4th Cir. 2001). Notably, "[a]t the summary judgment stage, once we have viewed the evidence in the light most favorable to the nonmovant, the question of whether the officer's actions were reasonable is a question of pure law." Henry, 652 F.3d at 531.

If a violation of Plaintiff's constitutional right is established, the second prong of qualified immunity analysis asks whether such right was clearly established at the time of the claimed violation. Harlow, 457 U.S. at 819. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202. In answering this dispositive inquiry, we "ordinarily need not look beyond the decisions of

the Supreme Court, this court of appeals, and the highest court of the state in which the case arose . . . ." Edwards v. City of Goldsboro, 178 F.3d 231, 251 (4th Cir. 1999) (quotation marks and alteration marks omitted) (ellipses in original).

Based upon the following qualified immunity analysis, we hold that Deputy Matthews and Deputy Gilstrap are entitled to qualified immunity from Plaintiff's excessive force claims, but that Detective Babb and Deputy Estes are not entitled to qualified immunity at the summary judgment stage.

### A. Deputy Matthews.

Plaintiff claims that Deputy Matthews' actions in tasering and pepper spraying him constituted excessive force in violation of his Fourth Amendment right to be free from unreasonable seizures. We agree with Deputy Matthews that he is entitled to qualified immunity because his actions are objectively reasonable in light of the facts and circumstances confronting him. The first relevant factor in our reaching this conclusion is the severity of the crime at issue. Graham, 490 U.S. at 396. At the outset, Deputy Matthews responded to an emergency report that two white men were destroying someone's property. While willful and wanton injury to real property is a misdemeanor crime in North Carolina, N.C. Gen. Stat. § 14-147, it nonetheless is more than a minor one. Moreover, consistent with the report of criminal conduct to which Deputy Matthews

responded, when he arrived at the scene, he observed two white men and ran over part of an address sign lying in the road. A reasonable officer would have concluded that these two men were the subjects of the property destruction dispatch call. This factor cuts in favor of Deputy Matthews.

The second relevant factor is whether Plaintiff posed an immediate threat to the safety of Deputy Matthews or others. Graham, 490 U.S. at 396. Shortly after Deputy Matthews arrived on the scene, one of the two men informed Deputy Matthews that his friend, the other white man, had lost his mind, that something was wrong with him, and that he needed help. At this point, a reasonable officer already would be guarded about his own safety and would have reasonably believed that these two men were the subjects of the property destruction dispatch. Plaintiff, who Deputy Matthews had just been told had lost his mind and needed help, then approached Deputy Matthews with his hands up in front of his face until he came within an arm's length of Deputy Matthews. At this point, Plaintiff verbally confirmed that he indeed had lost his mind. After attempting unsuccessfully to put a safe reactionary gap between himself and Plaintiff several times while being hemmed in between his open patrol car door and his patrol car, Deputy Matthews reasonably perceived to be physically threatened by this self-proclaimed (and bystander confirmed) crazy man despite the fact that

- 16 -

Plaintiff was unarmed. This factor cuts in favor of Deputy Matthews.

Given the circumstances thus far, Deputy Matthews acted reasonably in commanding that Plaintiff drop to the ground while pointing his taser at Plaintiff. The next factor now comes into play: Was Plaintiff actively resisting arrest or attempting to evade arrest by flight? Id. While Deputy Matthews did not announce that he was placing Plaintiff under arrest, he did command Plaintiff to get down on the ground in order to secure his (Deputy Matthews') own safety. Deputy Matthews then observed Plaintiff attempt to flee the scene of his crime in an unstable mental condition instead of complying with the command to get down on the ground. Accordingly, this factor cuts in favor of Deputy Matthews as well.

The last factor considers the extent of Plaintiff's injury. Jones, 325 F.3d at 527. The record shows that Plaintiff suffered two minor puncture wounds as the result of the two taser prongs entering his back. The record shows that Plaintiff suffered no injury from the pepper spray. In the big scheme of potential injuries from the use of excessive force, this factor cuts in favor of Deputy Matthews.

Focusing on the moment that force was employed, in light of the totality of the circumstances, Deputy Matthews acted reasonably in tasering Plaintiff the first time in an attempt to

temporarily subdue him and secure the scene. While tasering a suspect "in general, is more than a non-serious or trivial use of force," it is "less than deadly force . . . ." Mattos v. Agarano, 590 F.3d 1082, 1087 (9th Cir. 2010). For the same reasons, Deputy Matthews acted reasonably in tasering Plaintiff the second and third times when Plaintiff defied Deputy Matthews' commands to remain on the ground.

We now consider the pepper spraying. Focusing on the moment that force was employed (after Plaintiff broke the wire leads of Deputy Matthews' taser and stood up), in light of the totality of the circumstances, Deputy Matthews acted reasonably in using his pepper spray, which is a non-lethal, and normally only temporarily incapacitating device, in an attempt to temporarily subdue Plaintiff and secure the scene. Gaddis ex rel. Gaddis v. Redford Tp., 364 F.3d 763, 774 (6th Cir. 2004) (pepper spray is non-lethal, temporarily incapacitating tool of law enforcement).

Because Plaintiff could not forecast sufficient evidence for a reasonable jury to find that Deputy Matthews had violated Plaintiff's right to be free from unreasonable seizures, the district court erred in denying Deputy Matthews' motion for summary judgment based upon qualified immunity.

**B. Deputy Gilstrap.**

Fairly characterizing Plaintiff's allegations against Deputy Gilstrap, Plaintiff claims that Deputy Gilstrap's actions in tasering him three times while he lay prone and unarmed on the ground with Deputy Matthews sitting on his back in control of his right handcuffed arm constituted excessive force in violation of his Fourth Amendment right to be free from unreasonable seizures. This claim need not detain us long because, assuming arguendo that Deputy Gilstrap's tasering of Plaintiff three times violated Plaintiff's right to be free of seizures effectuated by excessive force, the unlawfulness of Deputy Gilstrap's actions was not clearly established at the time Deputy Gilstrap took such actions. Significantly, in contrast to the state of affairs at the moment that Detective Babb began to tase Plaintiff, at the moment that Deputy Gilstrap began to tase Plaintiff, the evidence, viewed in the light most favorable to Plaintiff, establishes that Plaintiff was not yet effectively secured. We have found no relevant authority establishing that Deputy Gilstrap's actions—tasering a person who, among other things, is not secured—transgressed a bright line. See Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992) ("Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines."). Accordingly, we agree with Deputy Gilstrap that he is entitled to qualified

- 19 -

immunity from Plaintiff's excessive force claim against him, and the district court erred in denying Deputy Gilstrap's motion for summary judgment based upon qualified immunity.

**C.  Detective Babb.**

Fairly characterizing Plaintiff's allegations against Detective Babb, Plaintiff claims that Detective Babb's actions in punching him four or five times in the back of the head with a closed fist and with great force while:  (1) he lay face down on the ground; (2) unarmed; (3) with one arm handcuffed behind his back being held by Deputy Matthews who was sitting on his back; and (4) while Deputy Gilstrap sat on one side of his buttocks and the corresponding leg, constituted excessive force in violation of his Fourth Amendment right to be free from unreasonable seizures.  Plaintiff also claims that Detective Babb's actions in tasering him four times after he was effectively secured also constituted unconstitutional excessive force.  We agree with the district court that Detective Babb is not entitled to qualified immunity at the summary judgment stage with respect to either set of actions.  Viewing the evidence in the summary judgment record in the light most favorable to Plaintiff, Detective Babb's actions (the punching and tasering) are objectively unreasonable in light of the facts and circumstances confronting him, and the law in this regard was clearly established at the time that Detective Babb took them.

## 1. Punching Plaintiff in the back of his head.

Of the relevant factors in our objective reasonableness analysis with respect to Detective Babb's actions in punching Plaintiff in the back of his head, the first (the severity of the crime) cuts in favor of Detective Babb, while the last three cut in favor of Plaintiff. The severity-of-the-crime factor is the same as in the case of Deputy Matthews. Speaking to the second factor, at the moment that Detective Babb punched Plaintiff, Plaintiff posed no immediate threat to the safety of the officers on the scene or others. At that moment, Plaintiff was unarmed, pinned face down to the ground by two officers of comparable size sitting on top of him, and his right arm was handcuffed and pulled behind his back by one of those officers. Indeed, Defendants' own expert witness on excessive force, John Combs, testified during his deposition in this case that the record contains no evidence that any officers at the scene were in imminent threat of death or serious bodily injury. Similarly, John Combs opined that Plaintiff never displayed any resistance rising to the level of deadly force. This factor cuts in favor of Plaintiff.

Speaking to the third factor, the evidence viewed in the light most favorable to Plaintiff establishes that Plaintiff, although squirming on the ground, was effectively incapable of actively resisting or attempting to evade arrest by flight at

the moment that Detective Babb starting punching him or thereafter. This factor cuts in favor of Plaintiff. Speaking to the fourth factor, the evidence viewed in the light most favorable to Plaintiff establishes that Detective Babb's punching caused Plaintiff to suffer abrasions to and bruising and swelling of his face. This factor cuts in favor of Plaintiff.

Dave Cloutier, Plaintiff's expert witness regarding the use of force, testified that the manner in which Detective Babb punched Plaintiff in the back of his head with a closed fist and with great force constituted the use of deadly force. Moreover, in his expert witness report, Cloutier points out that according to the Sherriff's Department's written policy: "*Deputies shall not **deliberately strike** another person **on the head**, spinal column, groin, solar plexus, kidneys, or throat with any issued or authorized equipment or **other object** unless the deputy reasonably believes **that his life or the life of a third party is threatened**.*'" (J.A. 2167) (emphasis in report).

Focusing on the moment that force was employed, in light of the totality of the circumstances, Detective Babb's actions were objectively unreasonable in punching Plaintiff four or five times in the back of the head with a closed fist and with great force in an effort to arrest him. See Tennessee v. Garner, 471 U.S. 1, 11 (1985) ("The use of deadly force to prevent the

escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable."); id. ("Where the suspect poses no immediate threat to the officer and no threat to others," officers may not use deadly force to apprehend the suspect.). The law in this regard was clearly established prior to April 27, 2009. Id. In sum, viewing the evidence in the summary judgment record in the light most favorable to Plaintiff, we hold that prior to April 27, 2009, a reasonable law enforcement officer in Detective Babb's position would have known that he was "transgressing" a "bright line" with regard to his punching actions. Maciariello, 973 F.2d at 298.

In sum, the district court correctly concluded that Detective Babb is not entitled to qualified immunity at the summary judgment stage with respect to Detective Babb's actions in punching Plaintiff in the back of the head.

## 2. Tasering Plaintiff Four Times.

Next we consider whether Detective Babb's actions in tasering Plaintiff four times amounted to excessive and unreasonable force under the circumstances. The answer is yes. While tasering a suspect "in general, is more than a non-serious or trivial use of force but less than deadly force . . ." Mattos, 590 F.3d at 1087, focusing on the moment that force was employed, in light of the totality of the circumstances, Detective Babb's actions were objectively unreasonable in

tasering Plaintiff four times while Plaintiff was effectively secured. By this point in time, Plaintiff lay unarmed, face down on the ground, had three fellow officers sitting on top of him (Deputy Matthews, Deputy Gilstrap, and Detective Holly) holding him down, one of those officers held Plaintiff's right handcuffed arm behind his back, and, although Plaintiff struggled in a squirming manner, Plaintiff did not attempt to get up off the ground. See Meyers, 713 F.3d at 734 ("It is an excessive and unreasonable use of force for a police officer repeatedly to administer electrical shocks with a taser on an individual who no longer is armed, has been brought to the ground, has been restrained physically by several other officers, and no longer is actively resisting arrest.").

The law in this regard was clearly established prior to April 27, 2009. Id. (law clearly established in March 2007 that police officer's tasering suspect who was unarmed and effectively secured with several officers sitting on his back violated suspect's Fourth Amendment right to be free from the use of excessive and unreasonable force). Viewing the evidence in the summary judgment record in the light most favorable to Plaintiff, the material distinction on this point between Detective Babb's tasering of Plaintiff and Deputy Gilstrap's tasering of Plaintiff is that, in contrast to the state of affairs when Gilstrap tasered Plaintiff, when Detective Babb

- 24 -

tasered Plaintiff, Plaintiff was effectively secured. By the time Detective Babb tasered Plaintiff, Plaintiff had three (not one) officers sitting on top of him holding him down and was suffering the physical effects of Detective Babb's and Deputy Estes' sequential use of deadly force on his head.

In sum, the district court correctly concluded that Detective Babb is not entitled to qualified immunity at the summary judgment stage with respect to Detective Babb's actions in tasering Plaintiff.

**D.  Deputy Estes.**

Turning to Deputy Estes, Plaintiff claims that Detective Estes' actions in striking him in the left side of his face several times with great force with his knee while he lay face down on the ground, unarmed, with one arm handcuffed behind his back, being held by Deputy Matthews sitting on his back, and with Deputy Gilstrap sitting on one side of his buttocks and his corresponding leg, constituted excessive force in violation of his Fourth Amendment right to be free from unreasonable seizures. We agree with the district court that Deputy Estes is not entitled to qualified immunity. Deputy Estes' actions in striking Plaintiff in the left side of his face several times with great force with his knee are objectively unreasonable in light of the facts and circumstances confronting him, and the

law in this regard was clearly established at the time he engaged in such actions.

As in the case of Detective Babb, of the relevant factors in our objective reasonableness analysis of Detective Estes' actions, the first (the severity of the crime) cuts in favor of Deputy Estes, but the last three cut in favor of Plaintiff. The severity-of-the-crime factor is the same as in the case of Deputy Matthews and Detective Babb. Addressing the second factor (whether Plaintiff posed an immediate threat to the safety of the officers on the scene or others), at the moment that Deputy Estes started striking Plaintiff on the left side of his face with great force with his knee, Plaintiff posed no immediate threat to the safety of the officers on the scene or others. Plaintiff was unarmed, pinned face down on the ground by two officers of comparable size sitting on top of him, his right arm was handcuffed and pulled behind his back, and one of the officers sitting on top of him had control of his handcuffed arm. At the time of Deputy Estes' forceful knee strikes to the left side of Plaintiff's face, none of the officers at the scene were in imminent threat of death or serious bodily injury, and Plaintiff displayed no resistance rising to the level of deadly force.

With respect to the third factor (whether Plaintiff was actively resisting or attempting to evade arrest by flight), the

evidence viewed in the light most favorable to Plaintiff establishes that Plaintiff, although squirming on the ground at the time that Deputy Estes started forcefully striking him in the face with his knee, was effectively incapable of actively resisting arrest or attempting to evade arrest by flight. Accordingly, this factor cuts in favor of Plaintiff. With respect to the fourth factor (the extent of Plaintiff's injury), the evidence viewed in the light most favorable to Plaintiff establishes that Deputy Estes' actions caused Plaintiff severe injury. Specifically, Deputy Estes struck Plaintiff in the left side of his face with such force that he fractured Plaintiff's jaw and severely damaged the root of one of Plaintiff's teeth.

Moreover, as in the case of Detective Babb's strikes to the back of Plaintiff's head, Dave Cloutier, Plaintiff's expert witness regarding the use of force, testified that the manner in which Deputy Estes struck Plaintiff in the left side of Plaintiff's face with his knee constituted the use of deadly force. Furthermore, as quoted above, the Sheriff's Department's written policy against deliberately striking a suspect on the head with an object, unless the officer reasonably believes that his life or the life of a third party is threatened, prohibited Deputy Estes' actions under the circumstances.

Focusing on the moment that force was employed, in light of the totality of the circumstances, we hold that Deputy Estes'

actions were objectively unreasonable in striking Plaintiff several times in the left side of Plaintiff's face with his knee with such force that he fractured Plaintiff's jaw and severely damaged the root of one of Plaintiff's teeth. See Garner, 471 U.S. at 11 ("The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable."); id. ("Where the suspect poses no immediate threat to the officer and no threat to others," officers may not use deadly force to apprehend the suspect.). The law in this regard was clearly established prior to April 27, 2009. Id. Viewing the evidence in the summary judgment record in the light most favorable to Plaintiff, prior to April 27, 2009, a reasonable law enforcement officer in Deputy Estes' position would have known that he was "transgressing" a "bright line" with regard to his actions. Maciariello, 973 F.2d at 298.

In sum, the district court correctly concluded that Deputy Estes is not entitled to qualified immunity at the summary judgment stage.

III

The Bystander Defendants next challenge the district court's denial of their respective motions for summary judgment asserting qualified immunity.

Under the theory of bystander liability, an officer may be liable only if such officer: "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." Randall v. Prince George's County, 302 F.3d 188, 204 (4th Cir. 2002) (footnote omitted). Here, given our holdings with respect to Plaintiff's excessive force claims, Part II supra, any bystander liability in this case must be based upon being a bystander to the unconstitutional conduct of Detective Babb and Deputy Estes. We address each Bystander Defendant individually.

**A. Detective Sergeant Marcum.**

We hold that Detective Sergeant Marcum is entitled to qualified immunity, and therefore, the district court erred in denying his motion for summary judgment asserting qualified immunity. Detective Sergeant Marcum is the officer who walked Gross across the street. Detective Sergeant Marcum admits to seeing the Excessive Force Defendants struggling with Plaintiff, but denies seeing anyone punch, strike, or kick Plaintiff. Plaintiff has presented no witness testimony or other evidence to put this testimony in dispute, and Plaintiff cannot defeat summary judgment by asserting that the jury might disbelieve Detective Sergeant Marcum. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (plaintiff may not defeat summary

- 29 -

judgment by merely asserting the jury might, and legally could, disbelieve defendant's denial); 10A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane & Richard L. Marcus, <u>Federal Practice and Procedure</u> § 2726 (3d ed. 1998) (specific facts must be produced in order to put credibility in issue so as to preclude summary judgment; unsupported allegations that credibility is in issue will not suffice).

**B. Deputy Melton.**

We hold that Deputy Melton is entitled to qualified immunity, and therefore, the district court erred in denying Deputy Melton's motion for summary judgment. The record is undisputed that Deputy Melton did not arrive at the scene until after Plaintiff had been transported to the hospital.

**C. Deputy Lloyd.**

We hold that Deputy Lloyd is entitled to qualified immunity, and therefore, the district court erred in denying his motion for summary judgment. In his sworn declaration in this case, Deputy Lloyd declares that he parked his patrol car at least two hundred yards away from the scene (Plaintiff on the ground). Once parked, he radioed his location to dispatch in case the need arose for him to get closer to the scene. After Deputy Lloyd heard over his radio that the situation was resolved and that the subject was in custody, he left the area. Plaintiff points to no evidence in the record to contradict

- 30 -

Deputy Lloyd's version of events, and thus, Plaintiff has not created a genuine issue of material fact with respect to his bystander liability claim against Deputy Lloyd. Anderson, 477 U.S. at 256.

**D. Lieutenant Allen.**

We hold that Lieutenant Allen is entitled to qualified immunity, and therefore, the district court erred in denying his motion for summary judgment. In his sworn declaration in this case, Lieutenant Allen declares that after he parked his patrol car along the side of St. Andrew's Church Road, he started to walk toward the other vehicles. He further declares that, as he walked, he saw from thirty to forty feet away several deputies struggling with Plaintiff. Within moments, as he was still walking up, he saw the deputies finish handcuffing Plaintiff. Lieutenant Allen denies seeing anyone strike, taser, or pepper spray Plaintiff. Plaintiff points to no evidence in the record to contradict Lieutenant Allen's version of events, and thus, Plaintiff has not created a genuine issue of material fact with respect to his bystander liability claim against Lieutenant Allen. Anderson, 477 U.S. at 256.

**E. Sheriff Carter.**

We hold that Sheriff Carter is entitled to qualified immunity, and therefore, the district court erred in denying his motion for summary judgment. In his deposition testimony,

Sheriff Carter testified that as he was walking toward the scene and still a considerable distance away, he observed Plaintiff on the ground and Deputy Estes striking Plaintiff once or twice in the head, neck, or back area with his knee. Just moments later, Sheriff Carter saw deputies successfully handcuff Plaintiff and step back from him. Sheriff Carter did not observe anyone else hit or strike Plaintiff, taser him, or pepper spray him. Under Sheriff Carter's version of events, no reasonable jury could find that Sheriff Carter had a reasonable opportunity to prevent the harm caused by Deputy Estes. By the time Sheriff Carter had gotten close enough to take any preventative action, Plaintiff was already handcuffed and all physical force against Plaintiff had stopped.

Plaintiff points to no evidence in the record to contradict Sheriff Carter's version of events, and thus, Plaintiff has not created a genuine issue of material fact with respect to his bystander liability claim against Sheriff Carter. Anderson, 477 U.S. at 256.

**F. Sergeant Smith.**

We hold that Sergeant Smith is entitled to qualified immunity, and therefore, the district court erred in denying Sergeant Smith's motion for summary judgment. When Sergeant Smith arrived, he walked up to where the officers were attempting to handcuff Plaintiff while Plaintiff was on the

ground. According to Sergeant Smith, "[t]here was five people around [Plaintiff] and . . . I couldn't do nothing. I couldn't get in there. If I got in there, I'd have to push somebody out of the way." (J.A. 1468). Sergeant Smith admits that he saw a deputy taser Plaintiff one time and saw Deputy Estes strike Plaintiff once in the side of the head with his knee. He saw no other force used against Plaintiff.

Assuming arguendo that Sergeant Smith understood that Deputy Estes and the officer who he saw taser Plaintiff one time had used excessive force, no reasonable jury could find that Sergeant Smith had a reasonable opportunity to prevent such harm but nevertheless chose not to do so. Sergeant Smith had no prior knowledge that either officer would take such action against Plaintiff. He only saw Deputy Estes knee Plaintiff in the side of the face one time and only saw the other officer taser Plaintiff one time. Plaintiff offers no evidence to the contrary.

In sum, all of the Bystander Defendants are entitled to qualified immunity.

IV.

The Assault and Battery Defendants next challenge the district court's denial of their motion for summary judgment on the basis that the doctrine of public officer immunity under

North Carolina law shields them from Plaintiff's respective North Carolina common law assault and battery claims. Because under North Carolina law public officer immunity is an immunity from suit rather than merely immunity from liability, we have appellate jurisdiction over the Assault and Battery Defendants' appeal in this regard. Bailey v. Kennedy, 349 F.3d 731, 739 (4th Cir. 2003).

Other than with respect to Detective Holly, Plaintiff's assault and battery claims go the way of Plaintiff's § 1983 excessive force claims. In North Carolina, official immunity protects a public official performing discretionary acts in the course of his official duties from suit in his individual capacity, so long as the public official acted without malice or corruption or outside the scope of his official duties. Evans, 703 F.3d at 656-67. "A defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." In re Grad v. Kaasa, 321 S.E.2d 888, 890 (N.C. 1984). "An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." Id. at 890-91 (internal quotation marks omitted).

For the same reasons that we affirm the denial of qualified immunity with respect to Plaintiff's § 1983 excessive force

claims against Detective Babb and Deputy Estes, we affirm the denial of public officer immunity with respect to Plaintiff's North Carolina assault and battery claims against Detective Babb and Deputy Estes. Bailey, 349 F.3d at 745 ("For the same reasons that we affirm the denial of qualified immunity on the § 1983 excessive force claim, we affirm the denial of public officers' immunity on the [North Carolina] common law assault and battery claim."); Glenn-Robinson v. Acker, 538 S.E.2d 601, 615 (N.C. Ct. App. 2000) (citizen can sue law enforcement officer for assault and battery if "the officer used force against plaintiff which was excessive under the given circumstances" (internal quotation marks omitted)).

We hold Deputy Matthews and Deputy Gilstrap are entitled to public officer immunity under North Carolina law with respect to Plaintiff's North Carolina common law assault and battery claims against them. Plaintiff has not proffered sufficient evidence for a reasonable jury to find that, with respect to any of Deputy Matthews' conduct toward Plaintiff, Deputy Matthews acted with malicious intent, with corruption or outside the scope of his duties. Evans, 703 F.3d at 656-67. The same goes for Deputy Gilstrap.

Now for Detective Holly. The evidence in the record is undisputed that Detective Holly's only physical conduct with respect to Plaintiff was getting on top of Plaintiff near his

shoulders and putting his knee between Plaintiff's shoulder blades while grabbing his free arm in an effort to help get him fully handcuffed while Plaintiff lay prone on the ground. This conduct is insufficient to defeat Detective Holly's claim of public officer immunity under North Carolina law. There is no evidence that Detective Holly acted with malicious intent, with corruption or outside the scope of his duties.

V.

In conclusion, we: (1) affirm the denial of Detective Babb's and Deputy Estes' respective motions for summary judgment (asserting claims for qualified immunity and public officer immunity) with respect to Plaintiff's § 1983 excessive force claims and his assault and battery claims under North Carolina common law; (2) vacate the district court's denial of Deputy Matthews' and Deputy Gilstrap's respective motions for summary judgment (asserting claims for qualified immunity and public officer immunity) with respect to Plaintiff's § 1983 excessive force claims and his assault and battery claims under North Carolina common law and remand this case to the district court with instructions to grant such motions; (3) vacate the district court's denial of the Bystander Defendants' respective motions for summary judgment (asserting claims for qualified immunity) with respect to Plaintiff's § 1983 bystander liability claims

and remand this case to the district court with instructions to grant such motions; and (4) vacate the district court's denial of Detective Holly's motion for summary judgment (asserting public officer immunity) with respect to Plaintiff's assault and battery claim under North Carolina common law and remand this case to the district court with instructions to grant such motion.

<u>AFFIRMED IN PART;</u>
<u>VACATED AND REMANDED IN PART</u>